# ROE ET AL. *v.* WADE, DISTRICT ATTORNEY OF DALLAS COUNTY

No. 70–18.  Argued December 13, 1971—Reargued October 11, 1972—Decided January 22, 1973

114

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and DOUGLAS, BRENNAN, STEWART, MARSHALL, and POWELL, JJ., joined. BURGER, C. J., *post,* p. 207, DOUGLAS, J., *post,* p. 209, and STEWART, J., *post,* p. 167, filed concurring opinions. WHITE, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post,* p. 221. REHNQUIST, J., filed a dissenting opinion, *post,* p. 171.

*Sarah Weddington* reargued the cause for appellants. With her on the briefs were *Roy Lucas, Fred Bruner, Roy L. Merrill, Jr.,* and *Norman Dorsen.*

*Robert C. Flowers,* Assistant Attorney General of Texas, argued the cause for appellee on the reargument. *Jay Floyd,* Assistant Attorney General, argued the cause for appellee on the original argument. With them on the brief were *Crawford C. Martin,* Attorney General, *Nola White,* First Assistant Attorney General, *Alfred Walker,* Executive Assistant Attorney General, *Henry Wade,* and *John B. Tolle.*\*

---

\*Briefs of *amici curiae* were filed by *Gary K. Nelson,* Attorney General of Arizona, *Robert K. Killian,* Attorney General of Connecticut, *Ed W. Hancock,* Attorney General of Kentucky, *Clarence A. H. Meyer,* Attorney General of Nebraska, and *Vernon B. Romney,* Attorney General of Utah; by *Joseph P. Witherspoon, Jr.,* for the Association of Texas Diocesan Attorneys; by *Charles E. Rice* for Americans United for Life; by *Eugene J. McMahon* for Women for the Unborn et al.; by *Carol Ryan* for the American College of Obstetricians and Gynecologists et al.; by *Dennis J. Horan, Jerome A. Frazel, Jr., Thomas M. Crisham,* and *Dolores V. Horan* for Certain Physicians, Professors and Fellows of the American College of Obstetrics and Gynecology; by *Harriet F. Pilpel, Nancy F. Wechsler,* and *Frederic S. Nathan* for Planned Parenthood Federation of America, Inc., et al.; by *Alan F. Charles* for the National Legal Program on Health Problems of the Poor et al.; by *Marttie L. Thompson* for State Communities Aid Assn.; by

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This Texas federal appeal and its Georgia companion, *Doe* v. *Bolton, post,* p. 179, present constitutional challenges to state criminal abortion legislation. The Texas statutes under attack here are typical of those that have been in effect in many States for approximately a century. The Georgia statutes, in contrast, have a modern cast and are a legislative product that, to an extent at least, obviously reflects the influences of recent attitudinal change, of advancing medical knowledge and techniques, and of new thinking about an old issue.

We forthwith acknowledge our awareness of the sensitive and emotional nature of the abortion controversy, of the vigorous opposing views, even among physicians, and of the deep and seemingly absolute convictions that the subject inspires. One's philosophy, one's experiences, one's exposure to the raw edges of human existence, one's religious training, one's attitudes toward life and family and their values, and the moral standards one establishes and seeks to observe, are all likely to influence and to color one's thinking and conclusions about abortion.

In addition, population growth, pollution, poverty, and racial overtones tend to complicate and not to simplify the problem.

Our task, of course, is to resolve the issue by constitutional measurement, free of emotion and of predilection. We seek earnestly to do this, and, because we do, we

---

*Alfred L. Scanlan, Martin J. Flynn,* and *Robert M. Byrn* for the National Right to Life Committee; by *Helen L. Buttenwieser* for the American Ethical Union et al.; by *Norma G. Zarky* for the American Association of University Women et al.; by *Nancy Stearns* for New Women Lawyers et al.; by the California Committee to Legalize Abortion et al.; and by *Robert E. Dunne* for Robert L. Sassone.

have inquired into, and in this opinion place some emphasis upon, medical and medical-legal history and what that history reveals about man's attitudes toward the abortion procedure over the centuries. We bear in mind, too, Mr. Justice Holmes' admonition in his now-vindicated dissent in *Lochner* v. *New York,* 198 U. S. 45, 76 (1905):

> "[The Constitution] is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar or novel and even shocking ought not to conclude our judgment upon the question whether statutes embodying them conflict with the Constitution of the United States."

## I

The Texas statutes that concern us here are Arts. 1191–1194 and 1196 of the State's Penal Code.[1] These make it a crime to "procure an abortion," as therein

---

[1] "Article 1191. Abortion

"If any person shall designedly administer to a pregnant woman or knowingly procure to be administered with her consent any drug or medicine, or shall use towards her any violence or means whatever externally or internally applied, and thereby procure an abortion, he shall be confined in the penitentiary not less than two nor more than five years; if it be done without her consent, the punishment shall be doubled. By 'abortion' is meant that the life of the fetus or embryo shall be destroyed in the woman's womb or that a premature birth thereof be caused.

"Art. 1192. Furnishing the means

"Whoever furnishes the means for procuring an abortion knowing the purpose intended is guilty as an accomplice.

"Art. 1193. Attempt at abortion

"If the means used shall fail to produce an abortion, the offender is nevertheless guilty of an attempt to produce abortion, provided it be shown that such means were calculated to produce that result,

defined, or to attempt one, except with respect to "an abortion procured or attempted by medical advice for the purpose of saving the life of the mother." Similar statutes are in existence in a majority of the States.[2]

and shall be fined not less than one hundred nor more than one thousand dollars.

"Art. 1194. Murder in producing abortion

"If the death of the mother is occasioned by an abortion so produced or by an attempt to effect the same it is murder."

"Art. 1196. By medical advice

"Nothing in this chapter applies to an abortion procured or attempted by medical advice for the purpose of saving the life of the mother."

The foregoing Articles, together with Art. 1195, compose Chapter 9 of Title 15 of the Penal Code. Article 1195, not attacked here, reads:

"Art. 1195. Destroying unborn child

"Whoever shall during parturition of the mother destroy the vitality or life in a child in a state of being born and before actual birth, which child would otherwise have been born alive, shall be confined in the penitentiary for life or for not less than five years."

[2] Ariz. Rev. Stat. Ann. § 13–211 (1956); Conn. Pub. Act No. 1 (May 1972 special session) (in 4 Conn. Leg. Serv. 677 (1972)), and Conn. Gen. Stat. Rev. §§ 53–29, 53–30 (1968) (or unborn child); Idaho Code § 18–601 (1948); Ill. Rev. Stat., c. 38, § 23–1 (1971); Ind. Code § 35–1–58–1 (1971); Iowa Code § 701.1 (1971); Ky. Rev. Stat. § 436.020 (1962); La. Rev. Stat. § 37:1285 (6) (1964) (loss of medical license) (but see § 14:87 (Supp. 1972) containing no exception for the life of the mother under the criminal statute); Me. Rev. Stat. Ann., Tit. 17, § 51 (1964); Mass. Gen. Laws Ann., c. 272, § 19 (1970) (using the term "unlawfully," construed to exclude an abortion to save the mother's life, *Kudish* v. *Bd. of Registration*, 356 Mass. 98, 248 N. E. 2d 264 (1969)); Mich. Comp. Laws § 750.14 (1948); Minn. Stat. § 617.18 (1971); Mo. Rev. Stat. § 559.100 (1969); Mont. Rev. Codes Ann. § 94–401 (1969); Neb. Rev. Stat. § 28–405 (1964); Nev. Rev. Stat. § 200.220 (1967); N. H. Rev. Stat. Ann. § 585:13 (1955); N. J. Stat. Ann. § 2A:87–1 (1969) ("without lawful justification"); N. D. Cent. Code §§ 12–25–01, 12–25–02 (1960); Ohio Rev. Code Ann. § 2901.16 (1953); Okla. Stat. Ann., Tit. 21, § 861 (1972–1973 Supp.); Pa. Stat. Ann., Tit. 18,

Texas first enacted a criminal abortion statute in 1854. Texas Laws 1854, c. 49, § 1, set forth in 3 H. Gammel, Laws of Texas 1502 (1898). This was soon modified into language that has remained substantially unchanged to the present time. See Texas Penal Code of 1857, c. 7, Arts. 531–536; G. Paschal, Laws of Texas, Arts. 2192–2197 (1866); Texas Rev. Stat., c. 8, Arts. 536–541 (1879); Texas Rev. Crim. Stat., Arts. 1071–1076 (1911). The final article in each of these compilations provided the same exception, as does the present Article 1196, for an abortion by "medical advice for the purpose of saving the life of the mother." [3]

§§ 4718, 4719 (1963) ("unlawful"); R. I. Gen. Laws Ann. § 11–3–1 (1969); S. D. Comp. Laws Ann. § 22–17–1 (1967); Tenn. Code Ann. §§ 39–301, 39–302 (1956); Utah Code Ann. §§ 76–2–1, 76–2–2 (1953); Vt. Stat. Ann., Tit. 13, § 101 (1958); W. Va. Code Ann. § 61–2–8 (1966); Wis. Stat. § 940.04 (1969); Wyo. Stat. Ann. §§ 6–77, 6–78 (1957).

[3] Long ago, a suggestion was made that the Texas statutes were unconstitutionally vague because of definitional deficiencies. The Texas Court of Criminal Appeals disposed of that suggestion peremptorily, saying only,

"It is also insisted in the motion in arrest of judgment that the statute is unconstitutional and void in that it does not sufficiently define or describe the offense of abortion. We do not concur in respect to this question." *Jackson* v. *State,* 55 Tex. Cr. R. 79, 89, 115 S. W. 262, 268 (1908).

The same court recently has held again that the State's abortion statutes are not unconstitutionally vague or overbroad. *Thompson* v. *State* (Ct. Crim. App. Tex. 1971), appeal docketed, No. 71–1200. The court held that "the State of Texas has a compelling interest to protect fetal life"; that Art. 1191 "is designed to protect fetal life"; that the Texas homicide statutes, particularly Art. 1205 of the Penal Code, are intended to protect a person "in existence by actual birth" and thereby implicitly recognize other human life that is not "in existence by actual birth"; that the definition of human life is for the legislature and not the courts; that Art. 1196 "is more definite than the District of Columbia statute upheld in [*United States* v.] *Vuitch*" (402 U. S. 62); and that the Texas statute "is

## II

Jane Roe,[4] a single woman who was residing in Dallas County, Texas, instituted this federal action in March 1970 against the District Attorney of the county. She sought a declaratory judgment that the Texas criminal abortion statutes were unconstitutional on their face, and an injunction restraining the defendant from enforcing the statutes.

Roe alleged that she was unmarried and pregnant; that she wished to terminate her pregnancy by an abortion "performed by a competent, licensed physician, under safe, clinical conditions"; that she was unable to get a "legal" abortion in Texas because her life did not appear to be threatened by the continuation of her pregnancy; and that she could not afford to travel to another jurisdiction in order to secure a legal abortion under safe conditions. She claimed that the Texas statutes were unconstitutionally vague and that they abridged her right of personal privacy, protected by the First, Fourth, Fifth, Ninth, and Fourteenth Amendments. By an amendment to her complaint Roe purported to sue "on behalf of herself and all other women" similarly situated.

James Hubert Hallford, a licensed physician, sought and was granted leave to intervene in Roe's action. In his complaint he alleged that he had been arrested previously for violations of the Texas abortion statutes and

---

not vague and indefinite or overbroad." A physician's abortion conviction was affirmed.

In *Thompson,* n. 2, the court observed that any issue as to the burden of proof under the exemption of Art. 1196 "is not before us." But see *Veevers* v. *State,* 172 Tex. Cr. R. 162, 168–169, 354 S. W. 2d 161, 166–167 (1962). Cf. *United States* v. *Vuitch,* 402 U. S. 62, 69–71 (1971).

[4] The name is a pseudonym.

that two such prosecutions were pending against him. He described conditions of patients who came to him seeking abortions, and he claimed that for many cases he, as a physician, was unable to determine whether they fell within or outside the exception recognized by Article 1196. He alleged that, as a consequence, the statutes were vague and uncertain, in violation of the Fourteenth Amendment, and that they violated his own and his patients' rights to privacy in the doctor-patient relationship and his own right to practice medicine, rights he claimed were guaranteed by the First, Fourth, Fifth, Ninth, and Fourteenth Amendments.

John and Mary Doe,[5] a married couple, filed a companion complaint to that of Roe. They also named the District Attorney as defendant, claimed like constitutional deprivations, and sought declaratory and injunctive relief. The Does alleged that they were a childless couple; that Mrs. Doe was suffering from a "neuralchemical" disorder; that her physician had "advised her to avoid pregnancy until such time as her condition has materially improved" (although a pregnancy at the present time would not present "a serious risk" to her life); that, pursuant to medical advice, she had discontinued use of birth control pills; and that if she should become pregnant, she would want to terminate the pregnancy by an abortion performed by a competent, licensed physician under safe, clinical conditions. By an amendment to their complaint, the Does purported to sue "on behalf of themselves and all couples similarly situated."

The two actions were consolidated and heard together by a duly convened three-judge district court. The suits thus presented the situations of the pregnant single woman, the childless couple, with the wife not pregnant,

---

[5] These names are pseudonyms.

and the licensed practicing physician, all joining in the attack on the Texas criminal abortion statutes. Upon the filing of affidavits, motions were made for dismissal and for summary judgment. The court held that Roe and members of her class, and Dr. Hallford, had standing to sue and presented justiciable controversies, but that the Does had failed to allege facts sufficient to state a present controversy and did not have standing. It concluded that, with respect to the requests for a declaratory judgment, abstention was not warranted. On the merits, the District Court held that the "fundamental right of single women and married persons to choose whether to have children is protected by the Ninth Amendment, through the Fourteenth Amendment," and that the Texas criminal abortion statutes were void on their face because they were both unconstitutionally vague and constituted an overbroad infringement of the plaintiffs' Ninth Amendment rights. The court then held that abstention was warranted with respect to the requests for an injunction. It therefore dismissed the Does' complaint, declared the abortion statutes void, and dismissed the application for injunctive relief. 314 F. Supp. 1217, 1225 (ND Tex. 1970).

The plaintiffs Roe and Doe and the intervenor Hallford, pursuant to 28 U. S. C. § 1253, have appealed to this Court from that part of the District Court's judgment denying the injunction. The defendant District Attorney has purported to cross-appeal, pursuant to the same statute, from the court's grant of declaratory relief to Roe and Hallford. Both sides also have taken protective appeals to the United States Court of Appeals for the Fifth Circuit. That court ordered the appeals held in abeyance pending decision here. We postponed decision on jurisdiction to the hearing on the merits. 402 U. S. 941 (1971).

## III

It might have been preferable if the defendant, pursuant to our Rule 20, had presented to us a petition for certiorari before judgment in the Court of Appeals with respect to the granting of the plaintiffs' prayer for declaratory relief. Our decisions in *Mitchell* v. *Donovan,* 398 U. S. 427 (1970), and *Gunn* v. *University Committee,* 399 U. S. 383 (1970), are to the effect that § 1253 does not authorize an appeal to this Court from the grant or denial of declaratory relief alone. We conclude, nevertheless, that those decisions do not foreclose our review of both the injunctive and the declaratory aspects of a case of this kind when it is properly here, as this one is, on appeal under § 1253 from specific denial of injunctive relief, and the arguments as to both aspects are necessarily identical. See *Carter* v. *Jury Comm'n,* 396 U. S. 320 (1970); *Florida Lime Growers* v. *Jacobsen,* 362 U. S. 73, 80–81 (1960). It would be destructive of time and energy for all concerned were we to rule otherwise. Cf. *Doe* v. *Bolton, post,* p. 179.

## IV

We are next confronted with issues of justiciability, standing, and abstention. Have Roe and the Does established that "personal stake in the outcome of the controversy," *Baker* v. *Carr,* 369 U. S. 186, 204 (1962), that insures that "the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution," *Flast* v. *Cohen,* 392 U. S. 83, 101 (1968), and *Sierra Club* v. *Morton,* 405 U. S. 727, 732 (1972)? And what effect did the pendency of criminal abortion charges against Dr. Hallford in state court have upon the propriety of the federal court's granting relief to him as a plaintiff-intervenor?

A. *Jane Roe*. Despite the use of the pseudonym, no suggestion is made that Roe is a fictitious person. For purposes of her case, we accept as true, and as established, her existence; her pregnant state, as of the inception of her suit in March 1970 and as late as May 21 of that year when she filed an alias affidavit with the District Court; and her inability to obtain a legal abortion in Texas.

Viewing Roe's case as of the time of its filing and thereafter until as late as May, there can be little dispute that it then presented a case or controversy and that, wholly apart from the class aspects, she, as a pregnant single woman thwarted by the Texas criminal abortion laws, had standing to challenge those statutes. *Abele* v. *Markle*, 452 F. 2d 1121, 1125 (CA2 1971); *Crossen* v. *Breckenridge*, 446 F. 2d 833, 838–839 (CA6 1971); *Poe* v. *Menghini*, 339 F. Supp. 986, 990–991 (Kan. 1972). See *Truax* v. *Raich*, 239 U. S. 33 (1915). Indeed, we do not read the appellee's brief as really asserting anything to the contrary. The "logical nexus between the status asserted and the claim sought to be adjudicated," *Flast* v. *Cohen*, 392 U. S., at 102, and the necessary degree of contentiousness, *Golden* v. *Zwickler*, 394 U. S. 103 (1969), are both present.

The appellee notes, however, that the record does not disclose that Roe was pregnant at the time of the District Court hearing on May 22, 1970,[6] or on the following June 17 when the court's opinion and judgment were filed. And he suggests that Roe's case must now be moot because she and all other members of her class are no longer subject to any 1970 pregnancy.

---

[6] The appellee twice states in his brief that the hearing before the District Court was held on July 22, 1970. Brief for Appellee 13. The docket entries, App. 2, and the transcript, App. 76, reveal this to be an error. The July date appears to be the time of the reporter's transcription. See App. 77.

The usual rule in federal cases is that an actual controversy must exist at stages of appellate or certiorari review, and not simply at the date the action is initiated. *United States* v. *Munsingwear, Inc.,* 340 U. S. 36 (1950); *Golden* v. *Zwickler, supra; SEC* v. *Medical Committee for Human Rights,* 404 U. S. 403 (1972).

But when, as here, pregnancy is a significant fact in the litigation, the normal 266-day human gestation period is so short that the pregnancy will come to term before the usual appellate process is complete. If that termination makes a case moot, pregnancy litigation seldom will survive much beyond the trial stage, and appellate review will be effectively denied. Our law should not be that rigid. Pregnancy often comes more than once to the same woman, and in the general population, if man is to survive, it will always be with us. Pregnancy provides a classic justification for a conclusion of nonmootness. It truly could be "capable of repetition, yet evading review." *Southern Pacific Terminal Co.* v. *ICC,* 219 U. S. 498, 515 (1911). See *Moore* v. *Ogilvie,* 394 U. S. 814, 816 (1969); *Carroll* v. *Princess Anne,* 393 U. S. 175, 178–179 (1968); *United States* v. *W. T. Grant Co.,* 345 U. S. 629, 632–633 (1953).

We, therefore, agree with the District Court that Jane Roe had standing to undertake this litigation, that she presented a justiciable controversy, and that the termination of her 1970 pregnancy has not rendered her case moot.

B. *Dr. Hallford.* The doctor's position is different. He entered Roe's litigation as a plaintiff-intervenor, alleging in his complaint that he:

"[I]n the past has been arrested for violating the Texas Abortion Laws and at the present time stands charged by indictment with violating said laws in the Criminal District Court of Dallas County, Texas to-wit: (1) The State of Texas vs.

James H. Hallford, No. C–69–5307–IH, and (2) The State of Texas vs. James H. Hallford, No. C–69–2524–H. In both cases the defendant is charged with abortion . . . ."

In his application for leave to intervene, the doctor made like representations as to the abortion charges pending in the state court. These representations were also repeated in the affidavit he executed and filed in support of his motion for summary judgment.

Dr. Hallford is, therefore, in the position of seeking, in a federal court, declaratory and injunctive relief with respect to the same statutes under which he stands charged in criminal prosecutions simultaneously pending in state court. Although he stated that he has been arrested in the past for violating the State's abortion laws, he makes no allegation of any substantial and immediate threat to any federally protected right that cannot be asserted in his defense against the state prosecutions. Neither is there any allegation of harassment or bad-faith prosecution. In order to escape the rule articulated in the cases cited in the next paragraph of this opinion that, absent harassment and bad faith, a defendant in a pending state criminal case cannot affirmatively challenge in federal court the statutes under which the State is prosecuting him, Dr. Hallford seeks to distinguish his status as a present state defendant from his status as a "potential future defendant" and to assert only the latter for standing purposes here.

We see no merit in that distinction. Our decision in *Samuels* v. *Mackell,* 401 U. S. 66 (1971), compels the conclusion that the District Court erred when it granted declaratory relief to Dr. Hallford instead of refraining from so doing. The court, of course, was correct in refusing to grant injunctive relief to the doctor. The reasons supportive of that action, however, are those expressed in *Samuels* v. *Mackell, supra,* and in *Younger* v.

*Harris,* 401 U. S. 37 (1971); *Boyle* v. *Landry,* 401 U. S. 77 (1971); *Perez* v. *Ledesma,* 401 U. S. 82 (1971); and *Byrne* v. *Karalexis,* 401 U. S. 216 (1971). See also *Dombrowski* v. *Pfister,* 380 U. S. 479 (1965). We note, in passing, that *Younger* and its companion cases were decided after the three-judge District Court decision in this case.

Dr. Hallford's complaint in intervention, therefore, is to be dismissed.[7] He is remitted to his defenses in the state criminal proceedings against him. We reverse the judgment of the District Court insofar as it granted Dr. Hallford relief and failed to dismiss his complaint in intervention.

C. *The Does.* In view of our ruling as to Roe's standing in her case, the issue of the Does' standing in their case has little significance. The claims they assert are essentially the same as those of Roe, and they attack the same statutes. Nevertheless, we briefly note the Does' posture.

Their pleadings present them as a childless married couple, the woman not being pregnant, who have no desire to have children at this time because of their having received medical advice that Mrs. Doe should avoid pregnancy, and for "other highly personal reasons." But they "fear . . . they may face the prospect of becoming

---

[7] We need not consider what different result, if any, would follow if Dr. Hallford's intervention were on behalf of a class. His complaint in intervention does not purport to assert a class suit and makes no reference to any class apart from an allegation that he "and others similarly situated" must necessarily guess at the meaning of Art. 1196. His application for leave to intervene goes somewhat further, for it asserts that plaintiff Roe does not adequately protect the interest of the doctor "and the class of people who are physicians . . . [and] the class of people who are . . . patients . . . ." The leave application, however, is not the complaint. Despite the District Court's statement to the contrary, 314 F. Supp., at 1225, we fail to perceive the essentials of a class suit in the Hallford complaint.

parents." And if pregnancy ensues, they "would want to terminate" it by an abortion. They assert an inability to obtain an abortion legally in Texas and, consequently, the prospect of obtaining an illegal abortion there or of going outside Texas to some place where the procedure could be obtained legally and competently.

We thus have as plaintiffs a married couple who have, as their asserted immediate and present injury, only an alleged "detrimental effect upon [their] marital happiness" because they are forced to "the choice of refraining from normal sexual relations or of endangering Mary Doe's health through a possible pregnancy." Their claim is that sometime in the future Mrs. Doe might become pregnant because of possible failure of contraceptive measures, and at that time in the future she might want an abortion that might then be illegal under the Texas statutes.

This very phrasing of the Does' position reveals its speculative character. Their alleged injury rests on possible future contraceptive failure, possible future pregnancy, possible future unpreparedness for parenthood, and possible future impairment of health. Any one or more of these several possibilities may not take place and all may not combine. In the Does' estimation, these possibilities might have some real or imagined impact upon their marital happiness. But we are not prepared to say that the bare allegation of so indirect an injury is sufficient to present an actual case or controversy. *Younger* v. *Harris,* 401 U. S., at 41–42; *Golden* v. *Zwickler,* 394 U. S., at 109–110; *Abele* v. *Markle,* 452 F. 2d, at 1124–1125; *Crossen* v. *Breckenridge,* 446 F. 2d, at 839. The Does' claim falls far short of those resolved otherwise in the cases that the Does urge upon us, namely, *Investment Co. Institute* v. *Camp,* 401 U. S. 617 (1971); *Data Processing Service* v. *Camp,* 397 U. S. 150 (1970);

and *Epperson* v. *Arkansas,* 393 U. S. 97 (1968). See also *Truax* v. *Raich,* 239 U. S. 33 (1915).

The Does therefore are not appropriate plaintiffs in this litigation. Their complaint was properly dismissed by the District Court, and we affirm that dismissal.

## V

The principal thrust of appellant's attack on the Texas statutes is that they improperly invade a right, said to be possessed by the pregnant woman, to choose to terminate her pregnancy. Appellant would discover this right in the concept of personal "liberty" embodied in the Fourteenth Amendment's Due Process Clause; or in personal, marital, familial, and sexual privacy said to be protected by the Bill of Rights or its penumbras, see *Griswold* v. *Connecticut,* 381 U. S. 479 (1965); *Eisenstadt* v. *Baird,* 405 U. S. 438 (1972); *id.,* at 460 (WHITE, J., concurring in result); or among those rights reserved to the people by the Ninth Amendment, *Griswold* v. *Connecticut,* 381 U. S., at 486 (Goldberg, J., concurring). Before addressing this claim, we feel it desirable briefly to survey, in several aspects, the history of abortion, for such insight as that history may afford us, and then to examine the state purposes and interests behind the criminal abortion laws.

## VI

It perhaps is not generally appreciated that the restrictive criminal abortion laws in effect in a majority of States today are of relatively recent vintage. Those laws, generally proscribing abortion or its attempt at any time during pregnancy except when necessary to preserve the pregnant woman's life, are not of ancient or even of common-law origin. Instead, they derive from statutory changes effected, for the most part, in the latter half of the 19th century.

1. *Ancient attitudes.* These are not capable of precise determination. We are told that at the time of the Persian Empire abortifacients were known and that criminal abortions were severely punished.[8] We are also told, however, that abortion was practiced in Greek times as well as in the Roman Era,[9] and that "it was resorted to without scruple." [10] The Ephesian, Soranos, often described as the greatest of the ancient gynecologists, appears to have been generally opposed to Rome's prevailing free-abortion practices. He found it necessary to think first of the life of the mother, and he resorted to abortion when, upon this standard, he felt the procedure advisable.[11] Greek and Roman law afforded little protection to the unborn. If abortion was prosecuted in some places, it seems to have been based on a concept of a violation of the father's right to his offspring. Ancient religion did not bar abortion.[12]

2. *The Hippocratic Oath.* What then of the famous Oath that has stood so long as the ethical guide of the medical profession and that bears the name of the great Greek (460(?)–377(?) B. C.), who has been described

---

[8] A. Castiglioni, A History of Medicine 84 (2d ed. 1947), E. Krumbhaar, translator and editor (hereinafter Castiglioni).

[9] J. Ricci, The Genealogy of Gynaecology 52, 84, 113, 149 (2d ed. 1950) (hereinafter Ricci); L. Lader, Abortion 75–77 (1966) (hereinafter Lader); K. Niswander, Medical Abortion Practices in the United States, in Abortion and the Law 37, 38–40 (D. Smith ed. 1967); G. Williams, The Sanctity of Life and the Criminal Law 148 (1957) (hereinafter Williams); J. Noonan, An Almost Absolute Value in History, in The Morality of Abortion 1, 3–7 (J. Noonan ed. 1970) (hereinafter Noonan); Quay, Justifiable Abortion—Medical and Legal Foundations (pt. 2), 49 Geo. L. J. 395, 406–422 (1961) (hereinafter Quay).

[10] L. Edelstein, The Hippocratic Oath 10 (1943) (hereinafter Edelstein). But see Castiglioni 227.

[11] Edelstein 12; Ricci 113–114, 118–119; Noonan 5.

[12] Edelstein 13–14.

as the Father of Medicine, the "wisest and the greatest practitioner of his art," and the "most important and most complete medical personality of antiquity," who dominated the medical schools of his time, and who typified the sum of the medical knowledge of the past? [13] The Oath varies somewhat according to the particular translation, but in any translation the content is clear: "I will give no deadly medicine to anyone if asked, nor suggest any such counsel; and in like manner I will not give to a woman a pessary to produce abortion," [14] or "I will neither give a deadly drug to anybody if asked for it, nor will I make a suggestion to this effect. Similarly, I will not give to a woman an abortive remedy." [15]

Although the Oath is not mentioned in any of the principal briefs in this case or in *Doe* v. *Bolton, post,* p. 179, it represents the apex of the development of strict ethical concepts in medicine, and its influence endures to this day. Why did not the authority of Hippocrates dissuade abortion practice in his time and that of Rome? The late Dr. Edelstein provides us with a theory: [16] The Oath was not uncontested even in Hippocrates' day; only the Pythagorean school of philosophers frowned upon the related act of suicide. Most Greek thinkers, on the other hand, commended abortion, at least prior to viability. See Plato, Republic, V, 461; Aristotle, Politics, VII, 1335b 25. For the Pythagoreans, however, it was a matter of dogma. For them the embryo was animate from the moment of conception, and abortion meant destruction of a living being. The abortion clause of the Oath, therefore, "echoes Pythagorean doctrines,"

[13] Castiglioni 148.
[14] *Id.,* at 154.
[15] Edelstein 3.
[16] *Id.,* at 12, 15–18.

and "[i]n no other stratum of Greek opinion were such views held or proposed in the same spirit of uncompromising austerity." [17]

Dr. Edelstein then concludes that the Oath originated in a group representing only a small segment of Greek opinion and that it certainly was not accepted by all ancient physicians. He points out that medical writings down to Galen (A. D. 130–200) "give evidence of the violation of almost every one of its injunctions." [18] But with the end of antiquity a decided change took place. Resistance against suicide and against abortion became common. The Oath came to be popular. The emerging teachings of Christianity were in agreement with the Pythagorean ethic. The Oath "became the nucleus of all medical ethics" and "was applauded as the embodiment of truth." Thus, suggests Dr. Edelstein, it is "a Pythagorean manifesto and not the expression of an absolute standard of medical conduct." [19]

This, it seems to us, is a satisfactory and acceptable explanation of the Hippocratic Oath's apparent rigidity. It enables us to understand, in historical context, a long-accepted and revered statement of medical ethics.

3. *The common law.* It is undisputed that at common law, abortion performed *before* "quickening"— the first recognizable movement of the fetus *in utero*, appearing usually from the 16th to the 18th week of pregnancy [20]—was not an indictable offense.[21] The ab-

---

[17] *Id.,* at 18; Lader 76.

[18] Edelstein 63.

[19] *Id.,* at 64.

[20] Dorland's Illustrated Medical Dictionary 1261 (24th ed. 1965).

[21] E. Coke, Institutes III *50; 1 W. Hawkins, Pleas of the Crown, c. 31, § 16 (4th ed. 1762); 1 W. Blackstone, Commentaries *129–130; M. Hale, Pleas of the Crown 433 (1st Amer. ed. 1847). For discussions of the role of the quickening concept in English common law, see Lader 78; Noonan 223–226; Means, The Law of New

sence of a common-law crime for pre-quickening abortion appears to have developed from a confluence of earlier philosophical, theological, and civil and canon law concepts of when life begins. These disciplines variously approached the question in terms of the point at which the embryo or fetus became "formed" or recognizably human, or in terms of when a "person" came into being, that is, infused with a "soul" or "animated." A loose consensus evolved in early English law that these events occurred at some point between conception and live birth.[22] This was "mediate animation." Although

York Concerning Abortion and the Status of the Foetus, 1664–1968: A Case of Cessation of Constitutionality (pt. 1), 14 N. Y. L. F. 411, 418–428 (1968) (hereinafter Means I) ; Stern, Abortion: Reform and the Law, 59 J. Crim. L. C. & P. S. 84 (1968) (hereinafter Stern) ; Quay 430–432; Williams 152.

[22] Early philosophers believed that the embryo or fetus did not become formed and begin to live until at least 40 days after conception for a male, and 80 to 90 days for a female. See, for example, Aristotle, Hist. Anim. 7.3.583b; Gen. Anim. 2.3.736, 2.5.741; Hippocrates, Lib. de Nat. Puer., No. 10. Aristotle's thinking derived from his three-stage theory of life: vegetable, animal, rational. The vegetable stage was reached at conception, the animal at "animation," and the rational soon after live birth. This theory, together with the 40/80 day view, came to be accepted by early Christian thinkers.

The theological debate was reflected in the writings of St. Augustine, who made a distinction between *embryo inanimatus,* not yet endowed with a soul, and *embryo animatus.* He may have drawn upon Exodus 21:22. At one point, however, he expressed the view that human powers cannot determine the point during fetal development at which the critical change occurs. See Augustine, De Origine Animae 4.4 (Pub. Law 44.527). See also W. Reany, The Creation of the Human Soul, c. 2 and 83–86 (1932) ; Huser, The Crime of Abortion in Canon Law 15 (Catholic Univ. of America, Canon Law Studies No. 162, Washington, D. C., 1942).

Galen, in three treatises related to embryology, accepted the thinking of Aristotle and his followers. Quay 426–427. Later, Augustine on abortion was incorporated by Gratian into the Decretum, published about 1140. Decretum Magistri Gratiani 2.32.2.7 to 2.32.2.10,

Christian theology and the canon law came to fix the point of animation at 40 days for a male and 80 days for a female, a view that persisted until the 19th century, there was otherwise little agreement about the precise time of formation or animation. There was agreement, however, that prior to this point the fetus was to be regarded as part of the mother, and its destruction, therefore, was not homicide. Due to continued uncertainty about the precise time when animation occurred, to the lack of any empirical basis for the 40–80-day view, and perhaps to Aquinas' definition of movement as one of the two first principles of life, Bracton focused upon quickening as the critical point. The significance of quickening was echoed by later common-law scholars and found its way into the received common law in this country.

Whether abortion of a *quick* fetus was a felony at common law, or even a lesser crime, is still disputed. Bracton, writing early in the 13th century, thought it homicide.[23] But the later and predominant view, following the great common-law scholars, has been that it was, at most, a lesser offense. In a frequently cited

---

in 1 Corpus Juris Canonici 1122, 1123 (A. Friedburg, 2d ed. 1879). This Decretal and the Decretals that followed were recognized as the definitive body of canon law until the new Code of 1917.

For discussions of the canon-law treatment, see Means I, pp. 411–412; Noonan 20–26; Quay 426–430; see also J. Noonan, Contraception: A History of Its Treatment by the Catholic Theologians and Canonists 18–29 (1965).

[23] Bracton took the position that abortion by blow or poison was homicide "if the foetus be already formed and animated, and particularly if it be animated." 2 H. Bracton, De Legibus et Consuetudinibus Angliae 279 (T. Twiss ed. 1879), or, as a later translation puts it, "if the foetus is already formed or quickened, especially if it is quickened," 2 H. Bracton, On the Laws and Customs of England 341 (S. Thorne ed. 1968). See Quay 431; see also 2 Fleta 60–61 (Book 1, c. 23) (Selden Society ed. 1955).

passage, Coke took the position that abortion of a woman "quick with childe" is "a great misprision, and no murder." [24] Blackstone followed, saying that while abortion after quickening had once been considered manslaughter (though not murder), "modern law" took a less severe view.[25] A recent review of the common-law precedents argues, however, that those precedents contradict Coke and that even post-quickening abortion was never established as a common-law crime.[26] This is of some importance because while most American courts ruled, in holding or dictum, that abortion of an unquickened fetus was not criminal under their received common law,[27] others followed Coke in stating that abor-

[24] E. Coke, Institutes III *50.

[25] 1 W. Blackstone, Commentaries *129–130.

[26] Means, The Phoenix of Abortional Freedom: Is a Penumbral or Ninth-Amendment Right About to Arise from the Nineteenth-Century Legislative Ashes of a Fourteenth-Century Common-Law Liberty?, 17 N. Y. L. F. 335 (1971) (hereinafter Means II). The author examines the two principal precedents cited marginally by Coke, both contrary to his dictum, and traces the treatment of these and other cases by earlier commentators. He concludes that Coke, who himself participated as an advocate in an abortion case in 1601, may have intentionally misstated the law. The author even suggests a reason: Coke's strong feelings against abortion, coupled with his determination to assert common-law (secular) jurisdiction to assess penalties for an offense that traditionally had been an exclusively ecclesiastical or canon-law crime. See also Lader 78–79, who notes that some scholars doubt that the common law ever was applied to abortion; that the English ecclesiastical courts seem to have lost interest in the problem after 1527; and that the preamble to the English legislation of 1803, 43 Geo. 3, c. 58, § 1, referred to in the text, *infra,* at 136, states that "no adequate means have been hitherto provided for the prevention and punishment of such offenses."

[27] *Commonwealth* v. *Bangs,* 9 Mass. 387, 388 (1812); *Commonwealth* v. *Parker,* 50 Mass. (9 Metc.) 263, 265–266 (1845); *State* v. *Cooper,* 22 N. J. L. 52, 58 (1849); *Abrams* v. *Foshee,* 3 Iowa 274, 278–280 (1856); *Smith* v. *Gaffard,* 31 Ala. 45, 51 (1857); *Mitchell* v. *Commonwealth,* 78 Ky. 204, 210 (1879); *Eggart* v. *State,* 40 Fla.

tion of a quick fetus was a "misprision," a term they translated to mean "misdemeanor." [28] That their reliance on Coke on this aspect of the law was uncritical and, apparently in all the reported cases, dictum (due probably to the paucity of common-law prosecutions for post-quickening abortion), makes it now appear doubtful that abortion was ever firmly established as a common-law crime even with respect to the destruction of a quick fetus.

4. *The English statutory law.* England's first criminal abortion statute, Lord Ellenborough's Act, 43 Geo. 3, c. 58, came in 1803. It made abortion of a quick fetus, § 1, a capital crime, but in § 2 it provided lesser penalties for the felony of abortion before quickening, and thus preserved the "quickening" distinction. This contrast was continued in the general revision of 1828, 9 Geo. 4, c. 31, § 13. It disappeared, however, together with the death penalty, in 1837, 7 Will. 4 & 1 Vict., c. 85, § 6, and did not reappear in the Offenses Against the Person Act of 1861, 24 & 25 Vict., c. 100, § 59, that formed the core of English anti-abortion law until the liberalizing reforms of 1967. In 1929, the Infant Life (Preservation) Act, 19 & 20 Geo. 5, c. 34, came into being. Its emphasis was upon the destruction of "the life of a child capable of being born alive." It made a willful act performed with the necessary intent a felony. It contained a proviso that one was not to be

---

527, 532, 25 So. 144, 145 (1898); *State* v. *Alcorn,* 7 Idaho 599, 606, 64 P. 1014, 1016 (1901); *Edwards* v. *State,* 79 Neb. 251, 252, 112 N. W. 611, 612 (1907); *Gray* v. *State,* 77 Tex. Cr. R. 221, 224, 178 S. W. 337, 338 (1915); *Miller* v. *Bennett,* 190 Va. 162, 169, 56 S. E. 2d 217, 221 (1949). Contra, *Mills* v. *Commonwealth,* 13 Pa. 631, 633 (1850); *State* v. *Slagle,* 83 N. C. 630, 632 (1880).

[28] See *Smith* v. *State,* 33 Me. 48, 55 (1851); *Evans* v. *People,* 49 N. Y. 86, 88 (1872); *Lamb* v. *State,* 67 Md. 524, 533, 10 A. 208 (1887).

found guilty of the offense "unless it is proved that the act which caused the death of the child was not done in good faith for the purpose only of preserving the life of the mother."

A seemingly notable development in the English law was the case of *Rex* v. *Bourne,* [1939] 1 K. B. 687. This case apparently answered in the affirmative the question whether an abortion necessary to preserve the life of the pregnant woman was excepted from the criminal penalties of the 1861 Act. In his instructions to the jury, Judge Macnaghten referred to the 1929 Act, and observed that that Act related to "the case where a child is killed by a wilful act at the time when it is being delivered in the ordinary course of nature." *Id.,* at 691. He concluded that the 1861 Act's use of the word "unlawfully," imported the same meaning expressed by the specific proviso in the 1929 Act, even though there was no mention of preserving the mother's life in the 1861 Act. He then construed the phrase "preserving the life of the mother" broadly, that is, "in a reasonable sense," to include a serious and permanent threat to the mother's *health,* and instructed the jury to acquit Dr. Bourne if it found he had acted in a good-faith belief that the abortion was necessary for this purpose. *Id.,* at 693–694. The jury did acquit.

Recently, Parliament enacted a new abortion law. This is the Abortion Act of 1967, 15 & 16 Eliz. 2, c. 87. The Act permits a licensed physician to perform an abortion where two other licensed physicians agree (a) "that the continuance of the pregnancy would involve risk to the life of the pregnant woman, or of injury to the physical or mental health of the pregnant woman or any existing children of her family, greater than if the pregnancy were terminated," or (b) "that there is a substantial risk that if the child were born it would suffer from such physical or mental abnormalities as

to be seriously handicapped." The Act also provides that, in making this determination, "account may be taken of the pregnant woman's actual or reasonably foreseeable environment." It also permits a physician, without the concurrence of others, to terminate a pregnancy where he is of the good-faith opinion that the abortion "is immediately necessary to save the life or to prevent grave permanent injury to the physical or mental health of the pregnant woman."

5. *The American law.* In this country, the law in effect in all but a few States until mid-19th century was the pre-existing English common law. Connecticut, the first State to enact abortion legislation, adopted in 1821 that part of Lord Ellenborough's Act that related to a woman "quick with child." [29] The death penalty was not imposed. Abortion before quickening was made a crime in that State only in 1860.[30] In 1828, New York enacted legislation [31] that, in two respects, was to serve as a model for early anti-abortion statutes. First, while barring destruction of an unquickened fetus as well as a quick fetus, it made the former only a misdemeanor, but the latter second-degree manslaughter. Second, it incorporated a concept of therapeutic abortion by providing that an abortion was excused if it "shall have been necessary to preserve the life of such mother, or shall have been advised by two physicians to be necessary for such purpose." By 1840, when Texas had received the common law,[32] only eight American States

---

[29] Conn. Stat., Tit. 20, § 14 (1821).

[30] Conn. Pub. Acts, c. 71, § 1 (1860).

[31] N. Y. Rev. Stat., pt. 4, c. 1, Tit. 2, Art. 1, § 9, p. 661, and Tit. 6, § 21, p. 694 (1829).

[32] Act of Jan. 20, 1840, § 1, set forth in 2 H. Gammel, Laws of Texas 177–178 (1898); see *Grigsby* v. *Reib,* 105 Tex. 597, 600, 153 S. W. 1124, 1125 (1913).

had statutes dealing with abortion.[33] It was not until after the War Between the States that legislation began generally to replace the common law. Most of these initial statutes dealt severely with abortion after quickening but were lenient with it before quickening. Most punished attempts equally with completed abortions. While many statutes included the exception for an abortion thought by one or more physicians to be necessary to save the mother's life, that provision soon disappeared and the typical law required that the procedure actually be necessary for that purpose.

Gradually, in the middle and late 19th century the quickening distinction disappeared from the statutory law of most States and the degree of the offense and the penalties were increased. By the end of the 1950's, a large majority of the jurisdictions banned abortion, however and whenever performed, unless done to save or preserve the life of the mother.[34] The exceptions, Alabama and the District of Columbia, permitted abortion to preserve the mother's health.[35] Three States permitted abortions that were not "unlawfully" performed or that were not "without lawful justification," leaving interpretation of those standards to the courts.[36] In

---

[33] The early statutes are discussed in Quay 435–438. See also Lader 85–88; Stern 85–86; and Means II 375–376.

[34] Criminal abortion statutes in effect in the States as of 1961, together with historical statutory development and important judicial interpretations of the state statutes, are cited and quoted in Quay 447–520. See Comment, A Survey of the Present Statutory and Case Law on Abortion: The Contradictions and the Problems, 1972 U. Ill. L. F. 177, 179, classifying the abortion statutes and listing 25 States as permitting abortion only if necessary to save or preserve the mother's life.

[35] Ala. Code, Tit. 14, § 9 (1958); D. C. Code Ann. § 22–201 (1967).

[36] Mass. Gen. Laws Ann., c. 272, § 19 (1970); N. J. Stat. Ann. § 2A:87–1 (1969); Pa. Stat. Ann., Tit. 18, §§ 4718, 4719 (1963).

the past several years, however, a trend toward liberalization of abortion statutes has resulted in adoption, by about one-third of the States, of less stringent laws, most of them patterned after the ALI Model Penal Code, § 230.3,[37] set forth as Appendix B to the opinion in *Doe* v. *Bolton, post,* p. 205.

It is thus apparent that at common law, at the time of the adoption of our Constitution, and throughout the major portion of the 19th century, abortion was viewed with less disfavor than under most American statutes currently in effect. Phrasing it another way, a woman enjoyed a substantially broader right to terminate a pregnancy than she does in most States today. At least with respect to the early stage of pregnancy, and very possibly without such a limitation, the oppor-

---

[37] Fourteen States have adopted some form of the ALI statute. See Ark. Stat. Ann. §§ 41–303 to 41–310 (Supp. 1971); Calif. Health & Safety Code §§ 25950–25955.5 (Supp. 1972); Colo. Rev. Stat. Ann. §§ 40–2–50 to 40–2–53 (Cum. Supp. 1967); Del. Code Ann., Tit. 24, §§ 1790–1793 (Supp. 1972); Florida Law of Apr. 13, 1972, c. 72–196, 1972 Fla. Sess. Law Serv., pp. 380–382; Ga. Code §§ 26–1201 to 26–1203 (1972); Kan. Stat. Ann. § 21–3407 (Supp. 1971); Md. Ann. Code, Art. 43, §§ 137–139 (1971); Miss. Code Ann. § 2223 (Supp. 1972); N. M. Stat. Ann. §§ 40A–5–1 to 40A–5–3 (1972); N. C. Gen. Stat. § 14–45.1 (Supp. 1971); Ore. Rev. Stat. §§ 435.405 to 435.495 (1971); S. C. Code Ann. §§ 16–82 to 16–89 (1962 and Supp. 1971); Va. Code Ann. §§ 18.1–62 to 18.1–62.3 (Supp. 1972). Mr. Justice Clark described some of these States as having "led the way." Religion, Morality, and Abortion: A Constitutional Appraisal, 2 Loyola U. (L. A.) L. Rev. 1, 11 (1969).

By the end of 1970, four other States had repealed criminal penalties for abortions performed in early pregnancy by a licensed physician, subject to stated procedural and health requirements. Alaska Stat. § 11.15.060 (1970); Haw. Rev. Stat. § 453–16 (Supp. 1971); N. Y. Penal Code § 125.05, subd. 3 (Supp. 1972–1973); Wash. Rev. Code §§ 9.02.060 to 9.02.080 (Supp. 1972). The precise status of criminal abortion laws in some States is made unclear by recent decisions in state and federal courts striking down existing state laws, in whole or in part.

tunity to make this choice was present in this country well into the 19th century. Even later, the law continued for some time to treat less punitively an abortion procured in early pregnancy.

6. *The position of the American Medical Association.* The anti-abortion mood prevalent in this country in the late 19th century was shared by the medical profession. Indeed, the attitude of the profession may have played a significant role in the enactment of stringent criminal abortion legislation during that period.

An AMA Committee on Criminal Abortion was appointed in May 1857. It presented its report, 12 Trans. of the Am. Med. Assn. 73–78 (1859), to the Twelfth Annual Meeting. That report observed that the Committee had been appointed to investigate criminal abortion "with a view to its general suppression." It deplored abortion and its frequency and it listed three causes of "this general demoralization":

> "The first of these causes is a wide-spread popular ignorance of the true character of the crime—a belief, even among mothers themselves, that the foetus is not alive till after the period of quickening.
>
> "The second of the agents alluded to is the fact that the profession themselves are frequently supposed careless of foetal life . . . .
>
> "The third reason of the frightful extent of this crime is found in the grave defects of our laws, both common and statute, as regards the independent and actual existence of the child before birth, as a living being. These errors, which are sufficient in most instances to prevent conviction, are based, and only based, upon mistaken and exploded medical dogmas. With strange inconsistency, the law fully acknowledges the foetus in utero and its inherent rights, for civil purposes; while personally and as criminally affected, it fails to recognize it,

and to its life as yet denies all protection." *Id.,* at 75–76.

The Committee then offered, and the Association adopted, resolutions protesting "against such unwarrantable destruction of human life," calling upon·state legislatures to revise their abortion laws, and requesting the cooperation of state medical societies "in pressing the subject." *Id.,* at 28, 78.

In 1871 a long and vivid report was submitted by the Committee on Criminal Abortion. It ended with the observation, "We had to deal with human life. In a matter of less importance we could entertain no compromise. An honest judge on the bench would call things by their proper names. We could do no less." 22 Trans. of the Am. Med. Assn. 258 (1871). It proffered resolutions, adopted by the Association, *id.,* at 38–39, recommending, among other things, that it "be unlawful and unprofessional for any physician to induce abortion· or premature labor, without the concurrent opinion of at least one respectable consulting physician, and then always with a view to the safety of the child—if that be possible," and calling "the attention of the clergy of all denominations to the perverted views of morality entertained by a large class of females—aye, and men also, on this important question."

Except for periodic condemnation of the criminal abortionist, no further formal AMA action took place until 1967. In that year, the Committee on Human Reproduction urged the adoption of a stated policy of opposition to induced abortion, except when there is "documented medical evidence" of a threat to the health or life of the mother, or that the child "may be born with incapacitating physical deformity or mental deficiency," or that a pregnancy "resulting from legally established statutory or forcible rape or incest may constitute a threat to the mental or physical health of the

patient," two other physicians "chosen because of their recognized professional competence have examined the patient and have concurred in writing," and the procedure "is performed in a hospital accredited by the Joint Commission on Accreditation of Hospitals." The providing of medical information by physicians to state legislatures in their consideration of legislation regarding therapeutic abortion was "to be considered consistent with the principles of ethics of the American Medical Association." This recommendation was adopted by the House of Delegates. Proceedings of the AMA House of Delegates 40-51 (June 1967).

In 1970, after the introduction of a variety of proposed resolutions, and of a report from its Board of Trustees, a reference committee noted "polarization of the medical profession on this controversial issue"; division among those who had testified; a difference of opinion among AMA councils and committees; "the remarkable shift in testimony" in six months, felt to be influenced "by the rapid changes in state laws and by the judicial decisions which tend to make abortion more freely available;" and a feeling "that this trend will continue." On June 25, 1970, the House of Delegates adopted preambles and most of the resolutions proposed by the reference committee. The preambles emphasized "the best interests of the patient," "sound clinical judgment," and "informed patient consent," in contrast to "mere acquiescence to the patient's demand." The resolutions asserted that abortion is a medical procedure that should be performed by a licensed physician in an accredited hospital only after consultation with two other physicians and in conformity with state law, and that no party to the procedure should be required to violate personally held moral principles.[38] Proceedings

[38] "Whereas, Abortion, like any other medical procedure, should not be performed when contrary to the best interests of the patient

of the AMA House of Delegates 220 (June 1970). The AMA Judicial Council rendered a complementary opinion.[39]

7. *The position of the American Public Health Association.* In October 1970, the Executive Board of the APHA adopted Standards for Abortion Services. These were five in number:

"a. Rapid and simple abortion referral must be readily available through state and local public

since good medical practice requires due' consideration for the patient's welfare and not mere acquiescence to the patient's demand; and

"Whereas, The standards of sound clinical judgment, which, together with informed patient consent should be determinative according to the merits of each individual case; therefore be it

"*RESOLVED,* That abortion is a medical procedure and should be performed only by a duly licensed physician and surgeon in an accredited hospital acting only after consultation with two other physicians chosen because of their professional competency and in conformance with standards of good medical practice and the Medical Practice Act of his State; and be it further

"*RESOLVED,* That no physician or other professional personnel shall be compelled to perform any act which violates his good medical judgment. Neither physician, hospital, nor hospital personnel shall be required to perform any act violative of personally-held moral principles. In these circumstances good medical practice requires only that the physician or other professional personnel withdraw from the case so long as the withdrawal is consistent with good medical practice." Proceedings of the AMA House of Delegates 220 (June 1970).

[39] "The Principles of Medical Ethics of the AMA do not prohibit a physician from performing an abortion that is performed in accordance with good medical practice and under circumstances that do not violate the laws of the community in which he practices.

"In the matter of abortions, as of any other medical procedure, the Judicial Council becomes involved whenever there is alleged violation of the Principles of Medical Ethics as established by the House of Delegates."

health departments, medical societies, or other non-profit organizations.

"b. An important function of counseling should be to simplify and expedite the provision of abortion services; it should not delay the obtaining of these services.

"c. Psychiatric consultation should not be mandatory. As in the case of other specialized medical services, psychiatric consultation should be sought for definite indications and not on a routine basis.

"d. A wide range of individuals from appropriately trained, sympathetic volunteers to highly skilled physicians may qualify as abortion counselors.

"e. Contraception and/or sterilization should be discussed with each abortion patient." Recommended Standards for Abortion Services, 61 Am. J. Pub. Health 396 (1971).

Among factors pertinent to life and health risks associated with abortion were three that "are recognized as important":

"a. the skill of the physician,

"b. the environment in which the abortion is performed, and above all

"c. the duration of pregnancy, as determined by uterine size and confirmed by menstrual history." *Id.*, at 397.

It was said that "a well-equipped hospital" offers more protection "to cope with unforeseen difficulties than an office or clinic without such resources. . . . The factor of gestational age is of overriding importance." Thus, it was recommended that abortions in the second trimester and early abortions in the presence of existing medical complications be performed in hospitals as in-patient procedures. For pregnancies in the first tri-

mester, abortion in the hospital with or without overnight stay "is probably the safest practice." An abortion in an extramural facility, however, is an acceptable alternative "provided arrangements exist in advance to admit patients promptly if unforeseen complications develop." Standards for an abortion facility were listed. It was said that at present abortions should be performed by physicians or osteopaths who are licensed to practice and who have "adequate training." *Id.*, at 398.

8. *The position of the American Bar Association.* At its meeting in February 1972 the ABA House of Delegates approved, with 17 opposing votes, the Uniform Abortion Act that had been drafted and approved the preceding August by the Conference of Commissioners on Uniform State Laws. 58 A. B. A. J. 380 (1972). We set forth the Act in full in the margin.[40] The

---

[40] "UNIFORM ABORTION ACT

"SECTION 1. [*Abortion Defined; When Authorized.*]

"(a) 'Abortion' means the termination of human pregnancy with an intention other than to produce a live birth or to remove a dead fetus.

"(b) An abortion may be performed in this state only if it is performed:

"(1) by a physician licensed to practice medicine [or osteopathy] in this state or by a physician practicing medicine [or osteopathy] in the employ of the government of the United States or of this state, [and the abortion is performed [in the physician's office or in a medical clinic, or] in a hospital approved by the [Department of Health] or operated by the United States, this state, or any department, agency, or political subdivision of either;] or by a female upon herself upon the advice of the physician; and

"(2) within [20] weeks after the commencement of the pregnancy [or after [20] weeks only if the physician has reasonable cause to believe (i) there is a substantial risk that continuance of the pregnancy would endanger the life of the mother or would gravely impair the physical or mental health of the mother, (ii) that the child would be born with grave physical or mental defect, or (iii) that

Conference has appended an enlightening Prefatory Note.[41]

## VII

Three reasons have been advanced to explain historically the enactment of criminal abortion laws in the 19th century and to justify their continued existence.

---

the pregnancy resulted from rape or incest, or illicit intercourse with a girl under the age of 16 years].

"SECTION 2. [*Penalty.*] Any person who performs or procures an abortion other than authorized by this Act is guilty of a [felony] and, upon conviction thereof, may be sentenced to pay a fine not exceeding [$1,000] or to imprisonment [in the state penitentiary] not exceeding [5 years], or both.

"SECTION 3. [*Uniformity of Interpretation.*] This Act shall be construed to effectuate its general purpose to make uniform the law with respect to the subject of this Act among those states which enact it.

"SECTION 4. [*Short Title.*] This Act may be cited as the Uniform Abortion Act.

"SECTION 5. [*Severability.*] If any provision of this Act or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of this Act which can be given effect without the invalid provision or application, and to this end the provisions of this Act are severable.

"SECTION 6. [*Repeal.*] The following acts and parts of acts are repealed:

"(1)

"(2)

"(3)

"SECTION 7. [*Time of Taking Effect.*] This Act shall take effect————————."

[41] "This Act is based largely upon the New York abortion act following a review of the more recent laws on abortion in several states and upon recognition of a more liberal trend in laws on this subject. Recognition was given also to the several decisions in state and federal courts which show a further trend toward liberalization of abortion laws, especially during the first trimester of pregnancy.

"Recognizing that a number of problems appeared in New York, a shorter time period for 'unlimited' abortions was advisable. The

148

It has been argued occasionally that these laws were the product of a Victorian social concern to discourage illicit sexual conduct. Texas, however, does not advance this justification in the present case, and it appears that no court or commentator has taken the argument seriously.[42] The appellants and *amici* contend, moreover, that this is not a proper state purpose at all and suggest that, if it were, the Texas statutes are overbroad in protecting it since the law fails to distinguish between married and unwed mothers.

A second reason is concerned with abortion as a medical procedure. When most criminal abortion laws were first enacted, the procedure was a hazardous one for the woman.[43] This was particularly true prior to the

time period was bracketed to permit the various states to insert a figure more in keeping with the different conditions that might exist among the states. Likewise, the language limiting the place or places in which abortions may be performed was also bracketed to account for different conditions among the states. In addition, limitations on abortions after the initial 'unlimited' period were placed in brackets so that individual states may adopt all or any of these reasons, or place further restrictions upon abortions after the initial period.

"This Act does not contain any provision relating to medical review committees or prohibitions against sanctions imposed upon medical personnel refusing to participate in abortions because of religious or other similar reasons, or the like. Such provisions, while related, do not directly pertain to when, where, or by whom abortions may be performed; however, the Act is not drafted to exclude such a provision by a state wishing to enact the same."

[42] See, for example, *YWCA* v. *Kugler,* 342 F. Supp. 1048, 1074 (N. J. 1972); *Abele* v. *Markle,* 342 F. Supp. 800, 805–806 (Conn. 1972) (Newman, J., concurring in result), appeal docketed, No. 72–56; *Walsingham* v. *State,* 250 So. 2d 857, 863 (Ervin, J., concurring) (Fla. 1971); *State* v. *Gedicke,* 43 N. J. L. 86, 90 (1881); Means II 381–382.

[43] See C. Haagensen & W. Lloyd, A Hundred Years of Medicine 19 (1943).

development of antisepsis. Antiseptic techniques, of course, were based on discoveries by Lister, Pasteur, and others first announced in 1867, but were not generally accepted and employed until about the turn of the century. Abortion mortality was high. Even after 1900, and perhaps until as late as the development of antibiotics in the 1940's, standard modern techniques such as dilation and curettage were not nearly so safe as they are today. Thus, it has been argued that a State's real concern in enacting a criminal abortion law was to protect the pregnant woman, that is, to restrain her from submitting to a procedure that placed her life in serious jeopardy.

Modern medical techniques have altered this situation. Appellants and various *amici* refer to medical data indicating that abortion in early pregnancy, that is, prior to the end of the first trimester, although not without its risk, is now relatively safe. Mortality rates for women undergoing early abortions, where the procedure is legal, appear to be as low as or lower than the rates for normal childbirth.[44] Consequently, any interest of the State in protecting the woman from an inherently hazardous procedure, except when it would be equally dangerous for her to forgo it, has largely disappeared. Of course, important state interests in the areas of health and medical standards do remain.

[44] Potts, Postconceptive Control of Fertility, 8 Int'l J. of G. & O. 957, 967 (1970) (England and Wales); Abortion Mortality, 20 Morbidity and Mortality 208, 209 (June 12, 1971) (U. S. Dept. of HEW, Public Health Service) (New York City); Tietze, United States: Therapeutic Abortions, 1963–1968, 59 Studies in Family Planning 5, 7 (1970); Tietze, Mortality with Contraception and Induced Abortion, 45 Studies in Family Planning 6 (1969) (Japan, Czechoslovakia, Hungary); Tietze & Lehfeldt, Legal Abortion in Eastern Europe, 175 J. A. M. A. 1149, 1152 (April 1961). Other sources are discussed in Lader 17–23.

The State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient. This interest obviously extends at least to the performing physician and his staff, to the facilities involved, to the availability of after-care, and to adequate provision for any complication or emergency that might arise. The prevalence of high mortality rates at illegal "abortion mills" strengthens, rather than weakens, the State's interest in regulating the conditions under which abortions are performed. Moreover, the risk to the woman increases as her pregnancy continues. Thus, the State retains a definite interest in protecting the woman's own health and safety when an abortion is proposed at a late stage of pregnancy.

The third reason is the State's interest—some phrase it in terms of duty—in protecting prenatal life. Some of the argument for this justification rests on the theory that a new human life is present from the moment of conception.[45] The State's interest and general obligation to protect life then extends, it is argued, to prenatal life. Only when the life of the pregnant mother herself is at stake, balanced against the life she carries within her, should the interest of the embryo or fetus not prevail. Logically, of course, a legitimate state interest in this area need not stand or fall on acceptance of the belief that life begins at conception or at some other point prior to live birth. In assessing the State's interest, recognition may be given to the less rigid claim that as long as at least *potential* life is involved, the State may assert interests beyond the protection of the pregnant woman alone.

[45] See Brief of *Amicus* National Right to Life Committee; R. Drinan, The Inviolability of the Right to Be Born, in Abortion and the Law 107 (D. Smith ed. 1967); Louisell, Abortion, The Practice of Medicine and the Due Process of Law, 16 U. C. L. A. L. Rev. 233 (1969); Noonan 1.

Parties challenging state abortion laws have sharply disputed in some courts the contention that a purpose of these laws, when enacted, was to protect prenatal life.[46] Pointing to the absence of legislative history to support the contention, they claim that most state laws were designed solely to protect the woman. Because medical advances have lessened this concern, at least with respect to abortion in early pregnancy, they argue that with respect to such abortions the laws can no longer be justified by any state interest. There is some scholarly support for this view of original purpose.[47] The few state courts called upon to interpret their laws in the late 19th and early 20th centuries did focus on the State's interest in protecting the woman's health rather than in preserving the embryo and fetus.[48] Proponents of this view point out that in many States, including Texas,[49] by statute or judicial interpretation, the pregnant woman herself could not be prosecuted for self-abortion or for cooperating in an abortion performed upon her by another.[50] They claim that adoption of the "quickening" distinction through received common

---

[46] See, e. g., Abele v. Markle, 342 F. Supp. 800 (Conn. 1972), appeal docketed, No. 72–56.

[47] See discussions in Means I and Means II.

[48] See, e. g., State v. Murphy, 27 N. J. L. 112, 114 (1858).

[49] Watson v. State, 9 Tex. App. 237, 244–245 (1880); Moore v. State, 37 Tex. Cr. R. 552, 561, 40 S. W. 287, 290 (1897); Shaw v. State, 73 Tex. Cr. R. 337, 339, 165 S. W. 930, 931 (1914); Fondren v. State, 74 Tex. Cr. R. 552, 557, 169 S. W. 411, 414 (1914); Gray v. State, 77 Tex. Cr. R. 221, 229, 178 S. W. 337, 341 (1915). There is no immunity in Texas for the father who is not married to the mother. Hammett v. State, 84 Tex. Cr. R. 635, 209 S. W. 661 (1919); Thompson v. State (Ct. Crim. App. Tex. 1971), appeal docketed, No. 71–1200.

[50] See Smith v. State, 33 Me., at 55; In re Vince, 2 N. J. 443, 450, 67 A. 2d 141, 144 (1949). A short discussion of the modern law on this issue is contained in the Comment to the ALI's Model Penal Code § 207.11, at 158 and nn. 35–37 (Tent. Draft No. 9, 1959).

law and state statutes tacitly recognizes the greater health hazards inherent in late abortion and impliedly repudiates the theory that life begins at conception.

It is with these interests, and the weight to be attached to them, that this case is concerned.

## VIII

The Constitution does not explicitly mention any right of privacy. In a line of decisions, however, going back perhaps as far as *Union Pacific R. Co.* v. *Botsford,* 141 U. S. 250, 251 (1891), the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution. In varying contexts, the Court or individual Justices have, indeed, found at least the roots of that right in the First Amendment, *Stanley* v. *Georgia,* 394 U. S. 557, 564 (1969); in the Fourth and Fifth Amendments, *Terry* v. *Ohio,* 392 U. S. 1, 8–9 (1968), *Katz* v. *United States,* 389 U. S. 347, 350 (1967), *Boyd* v. *United States,* 116 U. S. 616 (1886), see *Olmstead* v. *United States,* 277 U. S. 438, 478 (1928) (Brandeis, J., dissenting); in the penumbras of the Bill of Rights, *Griswold* v. *Connecticut,* 381 U. S., at 484–485; in the Ninth Amendment, *id.,* at 486 (Goldberg, J., concurring); or in the concept of liberty guaranteed by the first section of the Fourteenth Amendment, see *Meyer* v. *Nebraska,* 262 U. S. 390, 399 (1923). These decisions make it clear that only personal rights that can be deemed "fundamental" or "implicit in the concept of ordered liberty," *Palko* v. *Connecticut,* 302 U. S. 319, 325 (1937), are included in this guarantee of personal privacy. They also make it clear that the right has some extension to activities relating to marriage, *Loving* v. *Virginia,* 388 U. S. 1, 12 (1967); procreation, *Skinner* v. *Oklahoma,* 316 U. S. 535, 541–542 (1942); contraception, *Eisenstadt* v. *Baird,* 405 U. S., at 453–454; *id.,* at 460, 463–

465 (WHITE, J., concurring in result); family relationships, *Prince* v. *Massachusetts,* 321 U. S. 158, 166 (1944); and child rearing and education, *Pierce* v. *Society of Sisters,* 268 U. S. 510, 535 (1925), *Meyer* v. *Nebraska, supra.*

This right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it is, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy. The detriment that the State would impose upon the pregnant woman by denying this choice altogether is apparent. Specific and direct harm medically diagnosable even in early pregnancy may be involved. Maternity, or additional offspring, may force upon the woman a distressful life and future. Psychological harm may be imminent. Mental and physical health may be taxed by child care. There is also the distress, for all concerned, associated with the unwanted child, and there is the problem of bringing a child into a family already unable, psychologically and otherwise, to care for it. In other cases, as in this one, the additional difficulties and continuing stigma of unwed motherhood may be involved. All these are factors the woman and her responsible physician necessarily will consider in consultation.

On the basis of elements such as these, appellant and some *amici* argue that the woman's right is absolute and that she is entitled to terminate her pregnancy at whatever time, in whatever way, and for whatever reason she alone chooses. With this we do not agree. Appellant's arguments that Texas either has no valid interest at all in regulating the abortion decision, or no interest strong enough to support any limitation upon the woman's sole determination, are unpersuasive. The

Court's decisions recognizing a right of privacy also acknowledge that some state regulation in areas protected by that right is appropriate. As noted above, a State may properly assert important interests in safeguarding health, in maintaining medical standards, and in protecting potential life. At some point in pregnancy, these respective interests become sufficiently compelling to sustain regulation of the factors that govern the abortion decision. The privacy right involved, therefore, cannot be said to be absolute. In fact, it is not clear to us that the claim asserted by some *amici* that one has an unlimited right to do with one's body as one pleases bears a close relationship to the right of privacy previously articulated in the Court's decisions. The Court has refused to recognize an unlimited right of this kind in the past. *Jacobson* v. *Massachusetts,* 197 U. S. 11 (1905) (vaccination); *Buck* v. *Bell,* 274 U. S. 200 (1927) (sterilization).

We, therefore, conclude that the right of personal privacy includes the abortion decision, but that this right is not unqualified and must be considered against important state interests in regulation.

We note that those federal and state courts that have recently considered abortion law challenges have reached the same conclusion. A majority, in addition to the District Court in the present case, have held state laws unconstitutional, at least in part, because of vagueness or because of overbreadth and abridgment of rights. *Abele* v. *Markle,* 342 F. Supp. 800 (Conn. 1972), appeal docketed, No. 72–56; *Abele* v. *Markle,* 351 F. Supp. 224 (Conn. 1972), appeal docketed, No. 72–730; *Doe* v. *Bolton,* 319 F. Supp. 1048 (ND Ga. 1970), appeal decided today, *post,* p. 179; *Doe* v. *Scott,* 321 F. Supp. 1385 (ND Ill. 1971), appeal docketed, No. 70–105; *Poe* v. *Menghini,* 339 F. Supp. 986 (Kan. 1972); *YWCA* v. *Kugler,* 342 F. Supp. 1048 (NJ 1972); *Babbitz* v. *McCann,*

310 F. Supp. 293 (ED Wis. 1970), appeal dismissed, 400 U. S. 1 (1970); *People* v. *Belous,* 71 Cal. 2d 954, 458 P. 2d 194 (1969), cert. denied, 397 U. S. 915 (1970); *State* v. *Barquet,* 262 So. 2d 431 (Fla. 1972).

Others have sustained state statutes. *Crossen* v. *Attorney General,* 344 F. Supp. 587 (ED Ky. 1972), appeal docketed, No. 72–256; *Rosen* v. *Louisiana State Board of Medical Examiners,* 318 F. Supp. 1217 (ED La. 1970), appeal docketed, No. 70–42; *Corkey* v. *Edwards,* 322 F. Supp. 1248 (WDNC 1971), appeal docketed, No. 71–92; *Steinberg* v. *Brown,* 321 F. Supp. 741 (ND Ohio 1970); *Doe* v. *Rampton* (Utah 1971), appeal docketed, No. 71–5666; *Cheaney* v. *State,* —— Ind. ——, 285 N. E. 2d 265 (1972); *Spears* v. *State,* 257 So. 2d 876 (Miss. 1972); *State* v. *Munson,* 86 S. D. 663, 201 N. W. 2d 123 (1972), appeal docketed, No. 72–631.

Although the results are divided, most of these courts have agreed that the right of privacy, however based, is broad enough to cover the abortion decision; that the right, nonetheless, is not absolute and is subject to some limitations; and that at some point the state interests as to protection of health, medical standards, and prenatal life, become dominant. We agree with this approach.

Where certain "fundamental rights" are involved, the Court has held that regulation limiting these rights may be justified only by a "compelling state interest," *Kramer* v. *Union Free School District,* 395 U. S. 621, 627 (1969); *Shapiro* v. *Thompson,* 394 U. S. 618, 634 (1969), *Sherbert* v. *Verner,* 374 U. S. 398, 406 (1963), and that legislative enactments must be narrowly drawn to express only the legitimate state interests at stake. *Griswold* v. *Connecticut,* 381 U. S., at 485; *Aptheker* v. *Secretary of State,* 378 U. S. 500, 508 (1964); *Cantwell* v. *Connecticut,* 310 U. S. 296, 307–308 (1940); see

*Eisenstadt* v. *Baird,* 405 U. S., at 460, 463–464 (WHITE, J., concurring in result).

In the recent abortion cases, cited above, courts have recognized these principles. Those striking down state laws have generally scrutinized the State's interests in protecting health and potential life, and have concluded that neither interest justified broad limitations on the reasons for which a physician and his pregnant patient might decide that she should have an abortion in the early stages of pregnancy. Courts sustaining state laws have held that the State's determinations to protect health or prenatal life are dominant and constitutionally justifiable.

## IX

The District Court held that the appellee failed to meet his burden of demonstrating that the Texas statute's infringement upon Roe's rights was necessary to support a compelling state interest, and that, although the appellee presented "several compelling justifications for state presence in the area of abortions," the statutes outstripped these justifications and swept "far beyond any areas of compelling state interest." 314 F. Supp., at 1222–1223. Appellant and appellee both contest that holding. Appellant, as has been indicated, claims an absolute right that bars any state imposition of criminal penalties in the area. Appellee argues that the State's determination to recognize and protect prenatal life from and after conception constitutes a compelling state interest. As noted above, we do not agree fully with either formulation.

A. The appellee and certain *amici* argue that the fetus is a "person" within the language and meaning of the Fourteenth Amendment. In support of this, they outline at length and in detail the well-known facts of fetal development. If this suggestion of personhood is established, the appellant's case, of course, collapses,

for the fetus' right to life would then be guaranteed specifically by the Amendment. The appellant conceded as much on reargument.[51] On the other hand, the appellee conceded on reargument [52] that no case could be cited that holds that a fetus is a person within the meaning of the Fourteenth Amendment.

The Constitution does not define "person" in so many words. Section 1 of the Fourteenth Amendment contains three references to "person." The first, in defining "citizens," speaks of "persons born or naturalized in the United States." The word also appears both in the Due Process Clause and in the Equal Protection Clause. "Person" is used in other places in the Constitution: in the listing of qualifications for Representatives and Senators, Art. I, § 2, cl. 2, and § 3, cl. 3; in the Apportionment Clause, Art. I, § 2, cl. 3; [53] in the Migration and Importation provision, Art. I, § 9, cl. 1; in the Emolument Clause, Art. I, § 9, cl. 8; in the Electors provisions, Art. II, § 1, cl. 2, and the superseded cl. 3; in the provision outlining qualifications for the office of President, Art. II, § 1, cl. 5; in the Extradition provisions, Art. IV, § 2, cl. 2, and the superseded Fugitive Slave Clause 3; and in the Fifth, Twelfth, and Twenty-second Amendments, as well as in §§ 2 and 3 of the Fourteenth Amendment. But in nearly all these instances, the use of the word is such that it has application only postnatally. None indicates, with any assurance, that it has any possible pre-natal application.[54]

---

[51] Tr. of Oral Rearg. 20–21.

[52] Tr. of Oral Rearg. 24.

[53] We are not aware that in the taking of any census under this clause, a fetus has ever been counted.

[54] When Texas urges that a fetus is entitled to Fourteenth Amendment protection as a person, it faces a dilemma. Neither in Texas nor in any other State are all abortions prohibited. Despite broad proscription, an exception always exists. The exception contained

All this, together with our observation, *supra*, that throughout the major portion of the 19th century prevailing legal abortion practices were far freer than they are today, persuades us that the word "person," as used in the Fourteenth Amendment, does not include the unborn.[55] This is in accord with the results reached in those few cases where the issue has been squarely presented. *McGarvey* v. *Magee-Womens Hospital*, 340 F. Supp. 751 (WD Pa. 1972); *Byrn* v. *New York City Health & Hospitals Corp.*, 31 N. Y. 2d 194, 286 N. E. 2d 887 (1972), appeal docketed, No. 72–434; *Abele* v. *Markle*, 351 F. Supp. 224 (Conn. 1972), appeal docketed, No. 72–730. Cf. *Cheaney* v. *State*, —— Ind., at ——, 285 N. E. 2d, at 270; *Montana* v. *Rogers*, 278 F. 2d 68, 72 (CA7 1960), aff'd *sub nom. Montana* v. *Kennedy*, 366 U. S. 308 (1961); *Keeler* v. *Superior Court*, 2 Cal. 3d 619, 470 P. 2d 617 (1970); *State* v. *Dickinson*, 28

in Art. 1196, for an abortion procured or attempted by medical advice for the purpose of saving the life of the mother, is typical. But if the fetus is a person who is not to be deprived of life without due process of law, and if the mother's condition is the sole determinant, does not the Texas exception appear to be out of line with the Amendment's command?

There are other inconsistencies between Fourteenth Amendment status and the typical abortion statute. It has already been pointed out, n. 49, *supra*, that in Texas the woman is not a principal or an accomplice with respect to an abortion upon her. If the fetus is a person, why is the woman not a principal or an accomplice? Further, the penalty for criminal abortion specified by Art. 1195 is significantly less than the maximum penalty for murder prescribed by Art. 1257 of the Texas Penal Code. If the fetus is a person, may the penalties be different?

[55] Cf. the Wisconsin abortion statute, defining "unborn child" to mean "a human being from the time of conception until it is born alive," Wis. Stat. § 940.04 (6) (1969), and the new Connecticut statute, Pub. Act No. 1 (May 1972 special session), declaring it to be the public policy of the State and the legislative intent "to protect and preserve human life from the moment of conception."

Ohio St. 2d 65, 275 N. E. 2d 599 (1971). Indeed, our decision in *United States* v. *Vuitch,* 402 U. S. 62 (1971), inferentially is to the same effect, for we there would not have indulged in statutory interpretation favorable to abortion in specified circumstances if the necessary consequence was the termination of life entitled to Fourteenth Amendment protection.

This conclusion, however, does not of itself fully answer the contentions raised by Texas, and we pass on to other considerations.

B. The pregnant woman cannot be isolated in her privacy. She carries an embryo and, later, a fetus, if one accepts the medical definitions of the developing young in the human uterus. See Dorland's Illustrated Medical Dictionary 478–479, 547 (24th ed. 1965). The situation therefore is inherently different from marital intimacy, or bedroom possession of obscene material, or marriage, or procreation, or education, with which *Eisenstadt* and *Griswold, Stanley, Loving, Skinner,* and *Pierce* and *Meyer* were respectively concerned. As we have intimated above, it is reasonable and appropriate for a State to decide that at some point in time another interest, that of health of the mother or that of potential human life, becomes significantly involved. The woman's privacy is no longer sole and any right of privacy she possesses must be measured accordingly.

Texas urges that, apart from the Fourteenth Amendment, life begins at conception and is present throughout pregnancy, and that, therefore, the State has a compelling interest in protecting that life from and after conception. We need not resolve the difficult question of when life begins. When those trained in the respective disciplines of medicine, philosophy, and theology are unable to arrive at any consensus, the judiciary, at this point in the development of man's knowledge, is not in a position to speculate as to the answer.

160

It should be sufficient to note briefly the wide divergence of thinking on this most sensitive and difficult question. There has always been strong support for the view that life does not begin until live birth. This was the belief of the Stoics.[56] It appears to be the predominant, though not the unanimous, attitude of the Jewish faith.[57] It may be taken to represent also the position of a large segment of the Protestant community, insofar as that can be ascertained; organized groups that have taken a formal position on the abortion issue have generally regarded abortion as a matter for the conscience of the individual and her family.[58] As we have noted, the common law found greater significance in quickening. Physicians and their scientific colleagues have regarded that event with less interest and have tended to focus either upon conception, upon live birth, or upon the interim point at which the fetus becomes "viable," that is, potentially able to live outside the mother's womb, albeit with artificial aid.[59] Viability is usually placed at about seven months (28 weeks) but may occur earlier, even at 24 weeks.[60] The Aristotelian theory of "mediate animation," that held sway throughout the Middle Ages and the Renaissance in Europe, continued to be official Roman Catholic dogma until the 19th century, despite opposition to this "ensoulment" theory from those in the Church who would recognize the existence of life from

[56] Edelstein 16.

[57] Lader 97–99; D. Feldman, Birth Control in Jewish Law 251–294 (1968). For a stricter view, see I. Jakobovits, Jewish Views on Abortion, in Abortion and the Law 124 (D. Smith ed. 1967).

[58] Amicus Brief for the American Ethical Union et al. For the position of the National Council of Churches and of other denominations, see Lader 99–101.

[59] L. Hellman & J. Pritchard, Williams Obstetrics 493 (14th ed. 1971); Dorland's Illustrated Medical Dictionary 1689 (24th ed. 1965).

[60] Hellman & Pritchard, *supra*, n. 59, at 493.

the moment of conception.[61] The latter is now, of course, the official belief of the Catholic Church. As one brief *amicus* discloses, this is a view strongly held by many non-Catholics as well, and by many physicians. Substantial problems for precise definition of this view are posed, however, by new embryological data that purport to indicate that conception is a "process" over time, rather than an event, and by new medical techniques such as menstrual extraction, the "morning-after" pill, implantation of embryos, artificial insemination, and even artificial wombs.[62]

In areas other than criminal abortion, the law has been reluctant to endorse any theory that life, as we recognize it, begins before live birth or to accord legal rights to the unborn except in narrowly defined situations and except when the rights are contingent upon live birth. For example, the traditional rule of tort law denied recovery for prenatal injuries even though the child was born alive.[63] That rule has been changed in almost every jurisdiction. In most States, recovery is said to be permitted only if the fetus was viable, or at least quick, when the injuries were sustained, though few

---

[61] For discussions of the development of the Roman Catholic position, see D. Callahan, Abortion: Law, Choice, and Morality 409–447 (1970); Noonan 1.

[62] See Brodie, The New Biology and the Prenatal Child, 9 J. Family L. 391, 397 (1970); Gorney, The New Biology and the Future of Man, 15 U. C. L. A. L. Rev. 273 (1968); Note, Criminal Law—Abortion—The "Morning-After Pill" and Other Pre-Implantation Birth-Control Methods and the Law, 46 Ore. L. Rev. 211 (1967); G. Taylor, The Biological Time Bomb 32 (1968); A. Rosenfeld, The Second Genesis 138–139 (1969); Smith, Through a Test Tube Darkly: Artificial Insemination and the Law, 67 Mich. L. Rev. 127 (1968); Note, Artificial Insemination and the Law, 1968 U. Ill. L. F. 203.

[63] W. Prosser, The Law of Torts 335–338 (4th ed. 1971); 2 F. Harper & F. James, The Law of Torts 1028–1031 (1956); Note, 63 Harv. L. Rev. 173 (1949).

courts have squarely so held.[64]   In a recent development, generally opposed by the commentators, some States permit the parents of a stillborn child to maintain an action for wrongful death because of prenatal injuries.[65]   Such an action, however, would appear to be one to vindicate the parents' interest and is thus consistent with the view that the fetus, at most, represents only the potentiality of life.   Similarly, unborn children have been recognized as acquiring rights or interests by way of inheritance or other devolution of property, and have been represented by guardians *ad litem.*[66]   Perfection of the interests involved, again, has generally been contingent upon live birth.   In short, the unborn have never been recognized in the law as persons in the whole sense.

## X

In view of all this, we do not agree that, by adopting one theory of life, Texas may override the rights of the pregnant woman that are at stake.   We repeat, however, that the State does have an important and legitimate interest in preserving and protecting the health of the pregnant woman, whether she be a resident of the State or a nonresident who seeks medical consultation and treatment there, and that it has still *another* important and legitimate interest in protecting the potentiality of human life.   These interests are separate and distinct.   Each grows in substantiality as the woman approaches

[64] See cases cited in Prosser, *supra,* n. 63, at 336–338; Annotation, Action for Death of Unborn Child, 15 A. L. R. 3d 992 (1967).

[65] Prosser, *supra,* n. 63, at 338; Note, The Law and the Unborn Child: The Legal and Logical Inconsistencies, 46 Notre Dame Law. 349, 354–360 (1971).

[66] Louisell, Abortion, The Practice of Medicine and the Due Process of Law, 16 U. C. L. A. L. Rev. 233, 235–238 (1969); Note, 56 Iowa L. Rev. 994, 999–1000 (1971); Note, The Law and the Unborn Child, 46 Notre Dame Law. 349, 351–354 (1971).

term and, at a point during pregnancy, each becomes "compelling."

With respect to the State's important and legitimate interest in the health of the mother, the "compelling" point, in the light of present medical knowledge, is at approximately the end of the first trimester. This is so because of the now-established medical fact, referred to above at 149, that until the end of the first trimester mortality in abortion may be less than mortality in normal childbirth. It follows that, from and after this point, a State may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health. Examples of permissible state regulation in this area are requirements as to the qualifications of the person who is to perform the abortion; as to the licensure of that person; as to the facility in which the procedure is to be performed, that is, whether it must be a hospital or may be a clinic or some other place of less-than-hospital status; as to the licensing of the facility; and the like.

This means, on the other hand, that, for the period of pregnancy prior to this "compelling" point, the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated. If that decision is reached, the judgment may be effectuated by an abortion free of interference by the State.

With respect to the State's important and legitimate interest in potential life, the "compelling" point is at viability. This is so because the fetus then presumably has the capability of meaningful life outside the mother's womb. State regulation protective of fetal life after viability thus has both logical and biological justifications. If the State is interested in protecting fetal life after viability, it may go so far as to proscribe abortion

during that period, except when it is necessary to preserve the life or health of the mother.

Measured against these standards, Art. 1196 of the Texas Penal Code, in restricting legal abortions to those "procured or attempted by medical advice for the purpose of saving the life of the mother," sweeps too broadly. The statute makes no distinction between abortions performed early in pregnancy and those performed later, and it limits to a single reason, "saving" the mother's life, the legal justification for the procedure. The statute, therefore, cannot survive the constitutional attack made upon it here.

This conclusion makes it unnecessary for us to consider the additional challenge to the Texas statute asserted on grounds of vagueness. See *United States* v. *Vuitch*, 402 U. S., at 67–72.

## XI

To summarize and to repeat:

1. A state criminal abortion statute of the current Texas type, that excepts from criminality only a *life-saving* procedure on behalf of the mother, without regard to pregnancy stage and without recognition of the other interests involved, is violative of the Due Process Clause of the Fourteenth Amendment.

(a) For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician.

(b) For the stage subsequent to approximately the end of the first trimester, the State, in promoting its interest in the health of the mother, may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health.

(c) For the stage subsequent to viability, the State in promoting its interest in the potentiality of human life

may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.

2. The State may define the term "physician," as it has been employed in the preceding paragraphs of this Part XI of this opinion, to mean only a physician currently licensed by the State, and may proscribe any abortion by a person who is not a physician as so defined.

In *Doe* v. *Bolton, post,* p. 179, procedural requirements contained in one of the modern abortion statutes are considered. That opinion and this one, of course, are to be read together.[67]

This holding, we feel, is consistent with the relative weights of the respective interests involved, with the lessons and examples of medical and legal history, with the lenity of the common law, and with the demands of the profound problems of the present day. The decision leaves the State free to place increasing restrictions on abortion as the period of pregnancy lengthens, so long as those restrictions are tailored to the recognized state interests. The decision vindicates the right of the physician to administer medical treatment according to his professional judgment up to the points where important

---

[67] Neither in this opinion nor in *Doe* v. *Bolton, post,* p. 179, do we discuss the father's rights, if any exist in the constitutional context, in the abortion decision. No paternal right has been asserted in either of the cases, and the Texas and the Georgia statutes on their face take no cognizance of the father. We are aware that some statutes recognize the father under certain circumstances. North Carolina, for example, N. C. Gen. Stat. § 14–45.1 (Supp. 1971), requires written permission for the abortion from the husband when the woman is a married minor, that is, when she is less than 18 years of age, 41 N. C. A. G. 489 (1971); if the woman is an unmarried minor, written permission from the parents is required. We need not now decide whether provisions of this kind are constitutional.

state interests provide compelling justifications for intervention. Up to those points, the abortion decision in all its aspects is inherently, and primarily, a medical decision, and basic responsibility for it must rest with the physician. If an individual practitioner abuses the privilege of exercising proper medical judgment, the usual remedies, judicial and intra-professional, are available.

## XII

Our conclusion that Art. 1196 is unconstitutional means, of course, that the Texas abortion statutes, as a unit, must fall. The exception of Art. 1196 cannot be struck down separately, for then the State would be left with a statute proscribing all abortion procedures no matter how medically urgent the case.

Although the District Court granted appellant Roe declaratory relief, it stopped short of issuing an injunction against enforcement of the Texas statutes. The Court has recognized that different considerations enter into a federal court's decision as to declaratory relief, on the one hand, and injunctive relief, on the other. *Zwickler* v. *Koota,* 389 U. S. 241, 252–255 (1967); *Dombrowski* v. *Pfister,* 380 U. S. 479 (1965). We are not dealing with a statute that, on its face, appears to abridge free expression, an area of particular concern under *Dombrowski* and refined in *Younger* v. *Harris,* 401 U. S., at 50.

We find it unnecessary to decide whether the District Court erred in withholding injunctive relief, for we assume the Texas prosecutorial authorities will give full credence to this decision that the present criminal abortion statutes of that State are unconstitutional.

The judgment of the District Court as to intervenor Hallford is reversed, and Dr. Hallford's complaint in intervention is dismissed. In all other respects, the judg-

ment of the District Court is affirmed.    Costs are allowed to the appellee.                                    *It is so ordered.*

[For concurring opinion of MR. CHIEF JUSTICE BURGER, see *post,* p. 207.]

[For concurring opinion of MR. JUSTICE DOUGLAS, see *post,* p. 209.]

[For dissenting opinion of MR. JUSTICE WHITE, see *post,* p. 221.]

MR. JUSTICE STEWART, concurring.

In 1963, this Court, in *Ferguson* v. *Skrupa,* 372 U. S. 726, purported to sound the death knell for the doctrine of substantive due process, a doctrine under which many state laws had in the past been held to violate the Fourteenth Amendment.    As Mr. Justice Black's opinion for the Court in *Skrupa* put it: "We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws." *Id.,* at 730.[1]

Barely two years later, in *Griswold* v. *Connecticut,* 381 U. S. 479, the Court held a Connecticut birth control law unconstitutional.    In view of what had been so recently said in *Skrupa,* the Court's opinion in *Griswold* understandably did its best to avoid reliance on the Due Process Clause of the Fourteenth Amendment as the ground for decision.    Yet, the Connecticut law did not violate any provision of the Bill of Rights, nor any other specific provision of the Constitution.[2]    So it was clear

---

[1] Only Mr. Justice Harlan failed to join the Court's opinion, 372 U. S., at 733.

[2] There is no constitutional right of privacy, as such.    "[The Fourth] Amendment protects individual privacy against certain kinds of governmental intrusion, but its protections go further, and often have nothing to do with privacy at all.    Other provisions of

to me then, and it is equally clear to me now, that the *Griswold* decision can be rationally understood only as a holding that the Connecticut statute substantively invaded the "liberty" that is protected by the Due Process Clause of the Fourteenth Amendment.[3]  As so understood, *Griswold* stands as one in a long line of pre-*Skrupa* cases decided under the doctrine of substantive due process, and I now accept it as such.

"In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed." *Board of Regents* v. *Roth,* 408 U. S. 564, 572. The Constitution nowhere mentions a specific right of personal choice in matters of marriage and family life, but the "liberty" protected by the Due Process Clause of the Fourteenth Amendment covers more than those freedoms explicitly named in the Bill of Rights.  See *Schware* v. *Board of Bar Examiners,* 353 U. S. 232, 238–239; *Pierce* v. *Society of Sisters,* 268 U. S. 510, 534–535; *Meyer* v. *Nebraska,* 262 U. S. 390, 399–400.  Cf. *Shapiro* v. *Thompson,* 394 U. S. 618, 629–630; *United States* v. *Guest,* 383 U. S. 745, 757–758; *Carrington* v. *Rash,* 380 U. S. 89, 96; *Aptheker* v. *Secretary of State,* 378 U. S. 500, 505; *Kent* v. *Dulles,* 357 U. S. 116, 127; *Bolling* v. *Sharpe,* 347 U. S. 497, 499–500; *Truax* v. *Raich,* 239 U. S. 33, 41.

---

the Constitution protect personal privacy from other forms of governmental invasion.  But the protection of a person's *general* right to privacy—his right to be let alone by other people—is, like the protection of his property and of his very life, left largely to the law of the individual States." *Katz* v. *United States,* 389 U. S. 347, 350–351 (footnotes omitted).

[3] This was also clear to Mr. Justice Black, 381 U. S., at 507 (dissenting opinion); to Mr. Justice Harlan, 381 U. S., at 499 (opinion concurring in the judgment); and to MR. JUSTICE WHITE, 381 U. S., at 502 (opinion concurring in the judgment).  See also Mr. Justice Harlan's thorough and thoughtful opinion dissenting from dismissal of the appeal in *Poe* v. *Ullman,* 367 U. S. 497, 522.

As Mr. Justice Harlan once wrote: "[T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This 'liberty' is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints . . . and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment." *Poe* v. *Ullman,* 367 U. S. 497, 543 (opinion dissenting from dismissal of appeal) (citations omitted). In the words of Mr. Justice Frankfurter, "Great concepts like . . . 'liberty' . . . were purposely left to gather meaning from experience. For they relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged." *National Mutual Ins. Co.* v. *Tidewater Transfer Co.,* 337 U. S. 582, 646 (dissenting opinion).

Several decisions of this Court make clear that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment. *Loving* v. *Virginia,* 388 U. S. 1, 12; *Griswold* v. *Connecticut, supra; Pierce* v. *Society of Sisters, supra; Meyer* v. *Nebraska, supra.* See also *Prince* v. *Massachusetts,* 321 U. S. 158, 166; *Skinner* v. *Oklahoma,* 316 U. S. 535, 541. As recently as last Term, in *Eisenstadt* v. *Baird,* 405 U. S. 438, 453, we recognized "the right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person

as the decision whether to bear or beget a child." That right necessarily includes the right of a woman to decide whether or not to terminate her pregnancy. "Certainly the interests of a woman in giving of her physical and emotional self during pregnancy and the interests that will be affected throughout her life by the birth and raising of a child are of a far greater degree of significance and personal intimacy than the right to send a child to private school protected in Pierce v. Society of Sisters, 268 U. S. 510 (1925), or the right to teach a foreign language protected in Meyer v. Nebraska, 262 U. S. 390 (1923)." *Abele* v. *Markle,* 351 F. Supp. 224, 227 (Conn. 1972).

Clearly, therefore, the Court today is correct in holding that the right asserted by Jane Roe is embraced within the personal liberty protected by the Due Process Clause of the Fourteenth Amendment.

It is evident that the Texas abortion statute infringes that right directly. Indeed, it is difficult to imagine a more complete abridgment of a constitutional freedom than that worked by the inflexible criminal statute now in force in Texas. The question then becomes whether the state interests advanced to justify this abridgment can survive the "particularly careful scrutiny" that the Fourteenth Amendment here requires.

The asserted state interests are protection of the health and safety of the pregnant woman, and protection of the potential future human life within her. These are legitimate objectives, amply sufficient to permit a State to regulate abortions as it does other surgical procedures, and perhaps sufficient to permit a State to regulate abortions more stringently or even to prohibit them in the late stages of pregnancy. But such legislation is not before us, and I think the Court today has thoroughly demonstrated that these state interests cannot constitutionally support the broad abridgment of per-

sonal liberty worked by the existing Texas law. Accordingly, I join the Court's opinion holding that that law is invalid under the Due Process Clause of the Fourteenth Amendment.

MR. JUSTICE REHNQUIST, dissenting.

The Court's opinion brings to the decision of this troubling question both extensive historical fact and a wealth of legal scholarship. While the opinion thus commands my respect, I find myself nonetheless in fundamental disagreement with those parts of it that invalidate the Texas statute in question, and therefore dissent.

I

The Court's opinion decides that a State may impose virtually no restriction on the performance of abortions during the first trimester of pregnancy. Our previous decisions indicate that a necessary predicate for such an opinion is a plaintiff who was in her first trimester of pregnancy at some time during the pendency of her lawsuit. While a party may vindicate his own constitutional rights, he may not seek vindication for the rights of others. *Moose Lodge* v. *Irvis,* 407 U. S. 163 (1972); *Sierra Club* v. *Morton,* 405 U. S. 727 (1972). The Court's statement of facts in this case makes clear, however, that the record in no way indicates the presence of such a plaintiff. We know only that plaintiff Roe at the time of filing her complaint was a pregnant woman; for aught that appears in this record, she may have been in her *last* trimester of pregnancy as of the date the complaint was filed.

Nothing in the Court's opinion indicates that Texas might not constitutionally apply its proscription of abortion as written to a woman in that stage of pregnancy. Nonetheless, the Court uses her complaint against the Texas statute as a fulcrum for deciding that States may

impose virtually no restrictions on medical abortions performed during the *first* trimester of pregnancy. In deciding such a hypothetical lawsuit, the Court departs from the longstanding admonition that it should never "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Liverpool, New York & Philadelphia S. S. Co.* v. *Commissioners of Emigration,* 113 U. S. 33, 39 (1885). See also *Ashwander* v. *TVA,* 297 U. S. 288, 345 (1936) (Brandeis, J., concurring).

## II

Even if there were a plaintiff in this case capable of litigating the issue which the Court decides, I would reach a conclusion opposite to that reached by the Court. I have difficulty in concluding, as the Court does, that the right of "privacy" is involved in this case. Texas, by the statute here challenged, bars the performance of a medical abortion by a licensed physician on a plaintiff such as Roe. A transaction resulting in an operation such as this is not "private" in the ordinary usage of that word. Nor is the "privacy" that the Court finds here even a distant relative of the freedom from searches and seizures protected by the Fourth Amendment to the Constitution, which the Court has referred to as embodying a right to privacy. *Katz* v. *United States,* 389 U. S. 347 (1967).

If the Court means by the term "privacy" no more than that the claim of a person to be free from unwanted state regulation of consensual transactions may be a form of "liberty" protected by the Fourteenth Amendment, there is no doubt that similar claims have been upheld in our earlier decisions on the basis of that liberty. I agree with the statement of MR. JUSTICE STEWART in his concurring opinion that the "liberty," against deprivation of which without due process the Fourteenth

Amendment protects, embraces more than the rights found in the Bill of Rights. But that liberty is not guaranteed absolutely against deprivation, only against deprivation without due process of law. The test traditionally applied in the area of social and economic legislation is whether or not a law such as that challenged has a rational relation to a valid state objective. *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 491 (1955). The Due Process Clause of the Fourteenth Amendment undoubtedly does place a limit, albeit a broad one, on legislative power to enact laws such as this. If the Texas statute were to prohibit an abortion even where the mother's life is in jeopardy, I have little doubt that such a statute would lack a rational relation to a valid state objective under the test stated in *Williamson, supra.* But the Court's sweeping invalidation of any restrictions on abortion during the first trimester is impossible to justify under that standard, and the conscious weighing of competing factors that the Court's opinion apparently substitutes for the established test is far more appropriate to a legislative judgment than to a judicial one.

The Court eschews the history of the Fourteenth Amendment in its reliance on the "compelling state interest" test. See *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164, 179 (1972) (dissenting opinion). But the Court adds a new wrinkle to this test by transposing it from the legal considerations associated with the Equal Protection Clause of the Fourteenth Amendment to this case arising under the Due Process Clause of the Fourteenth Amendment. Unless I misapprehend the consequences of this transplanting of the "compelling state interest test," the Court's opinion will accomplish the seemingly impossible feat of leaving this area of the law more confused than it found it.

While the Court's opinion quotes from the dissent of Mr. Justice Holmes in *Lochner* v. *New York,* 198 U. S. 45, 74 (1905), the result it reaches is more closely attuned to the majority opinion of Mr. Justice Peckham in that case. As in *Lochner* and similar cases applying substantive due process standards to economic and social welfare legislation, the adoption of the compelling state interest standard will inevitably require this Court to examine the legislative policies and pass on the wisdom of these policies in the very process of deciding whether a particular state interest put forward may or may not be "compelling." The decision here to break pregnancy into three distinct terms and to outline the permissible restrictions the State may impose in each one, for example, partakes more of judicial legislation than it does of a determination of the intent of the drafters of the Fourteenth Amendment.

The fact that a majority of the States reflecting, after all, the majority sentiment in those States, have had restrictions on abortions for at least a century is a strong indication, it seems to me, that the asserted right to an abortion is not "so rooted in the traditions and conscience of our people as to be ranked as fundamental," *Snyder* v. *Massachusetts,* 291 U. S. 97, 105 (1934). Even today, when society's views on abortion are changing, the very existence of the debate is evidence that the "right" to an abortion is not so universally accepted as the appellant would have us believe.

To reach its result, the Court necessarily has had to find within the scope of the Fourteenth Amendment a right that was apparently completely unknown to the drafters of the Amendment. As early as 1821, the first state law dealing directly with abortion was enacted by the Connecticut Legislature. Conn. Stat., Tit. 22, §§ 14, 16. By the time of the adoption of the Four-

teenth Amendment in 1868, there were at least 36 laws enacted by state or territorial legislatures limiting abortion.[1] While many States have amended or updated

[1] Jurisdictions having enacted abortion laws prior to the adoption of the Fourteenth Amendment in 1868:

1. Alabama—Ala. Acts, c. 6, § 2 (1840).

2. Arizona—Howell Code, c. 10, § 45 (1865).

3. Arkansas—Ark. Rev. Stat., c. 44, div. III, Art. II, § 6 (1838).

4. California—Cal. Sess. Laws, c. 99, § 45, p. 233 (1849–1850).

5. Colorado (Terr.)—Colo. Gen. Laws of Terr. of Colo., 1st Sess., § 42, pp. 296–297 (1861).

6. Connecticut—Conn. Stat., Tit. 20, §§ 14, 16 (1821). By 1868, this statute had been replaced by another abortion law. Conn. Pub. Acts, c. 71, §§ 1, 2, p. 65 (1860).

7. Florida—Fla. Acts 1st Sess., c. 1637, subc. 3, §§ 10, 11, subc. 8, §§ 9, 10, 11 (1868), as amended, now Fla. Stat. Ann. §§ 782.09, 782.10, 797.01, 797.02, 782.16 (1965).

8. Georgia—Ga. Pen. Code, 4th Div., § 20 (1833).

9. Kingdom of Hawaii—Hawaii Pen. Code, c. 12, §§ 1, 2, 3 (1850).

10. Idaho (Terr.)—Idaho (Terr.) Laws, Crimes and Punishments §§ 33, 34, 42, pp. 441, 443 (1863).

11. Illinois—Ill. Rev. Criminal Code §§ 40, 41, 46, pp. 130, 131 (1827). By 1868, this statute had been replaced by a subsequent enactment. Ill. Pub. Laws §§ 1, 2, 3, p. 89 (1867).

12. Indiana—Ind. Rev. Stat. §§ 1, 3, p. 224 (1838). By 1868 this statute had been superseded by a subsequent enactment. Ind. Laws, c. LXXXI, § 2 (1859).

13. Iowa (Terr.)—Iowa (Terr.) Stat., 1st Legis., 1st Sess., § 18, p. 145 (1838). By 1868, this statute had been superseded by a subsequent enactment. Iowa (Terr.) Rev. Stat., c. 49, §§ 10, 13 (1843).

14. Kansas (Terr.)—Kan. (Terr.) Stat., c. 48, §§ 9, 10, 39 (1855). By 1868, this statute had been superseded by a subsequent enactment. Kan. (Terr.) Laws, c. 28, §§ 9, 10, 37 (1859).

15. Louisiana—La. Rev. Stat., Crimes and Offenses § 24, p. 138 (1856).

16. Maine—Me. Rev. Stat., c. 160, §§ 11, 12, 13, 14 (1840).

17. Maryland—Md. Laws, c. 179, § 2, p. 315 (1868).

18. Massachusetts—Mass. Acts & Resolves, c. 27 (1845).

19. Michigan—Mich. Rev. Stat., c. 153, §§ 32, 33, 34, p. 662 (1846).

their laws, 21 of the laws on the books in 1868 remain in effect today.[2] Indeed, the Texas statute struck down today was, as the majority notes, first enacted in 1857

20. Minnesota (Terr.)—Minn. (Terr.) Rev. Stat., c. 100, §§ 10, 11, p. 493 (1851).

21. Mississippi—Miss. Code, c. 64, §§ 8, 9, p. 958 (1848).

22. Missouri—Mo. Rev. Stat., Art. II, §§ 9, 10, 36, pp. 168, 172 (1835).

23. Montana (Terr.)—Mont. (Terr.) Laws, Criminal Practice Acts § 41, p. 184 (1864).

24. Nevada (Terr.)—Nev. (Terr.) Laws, c. 28, § 42, p. 63 (1861).

25. New Hampshire—N. H. Laws, c. 743, § 1, p. 708 (1848).

26. New Jersey—N. J. Laws, p. 266 (1849).

27. New York—N. Y. Rev. Stat., pt. 4, c. 1, Tit. 2, §§ 8, 9, pp. 12–13 (1828). By 1868, this statute had been superseded. N. Y. Laws, c. 260, §§ 1–6, pp. 285–286 (1845); N. Y. Laws, c. 22, § 1, p. 19 (1846).

28. Ohio—Ohio Gen. Stat. §§ 111 (1), 112 (2), p. 252 (1841).

29. Oregon—Ore. Gen. Laws, Crim. Code, c. 43, § 509, p. 528 (1845–1864).

30. Pennsylvania—Pa. Laws No. 374, §§ 87, 88, 89 (1860).

31. Texas—Tex. Gen. Stat. Dig., c. VII, Arts. 531–536, p. 524 (Oldham & White 1859).

32. Vermont—Vt. Acts No. 33, § 1 (1846). By 1868, this statute had been amended. Vt. Acts No. 57, §§ 1, 3 (1867).

33. Virginia—Va. Acts, Tit. II, c. 3, § 9, p. 96 (1848).

34. Washington (Terr.)—Wash. (Terr.) Stats., c. II, §§ 37, 38, p. 81 (1854).

35. West Virginia—See Va. Acts., Tit. II, c. 3, § 9, p. 96 (1848); W. Va. Const., Art. xi, par. 8 (1863).

36. Wisconsin—Wis. Rev. Stat., c. 133, §§ 10, 11 (1849). By 1868, this statute had been superseded. Wis. Rev. Stat., c. 164, §§ 10, 11; c. 169, §§ 58, 59 (1858).

[2] Abortion laws in effect in 1868 and still applicable as of August 1970:

1. Arizona (1865).

2. Connecticut (1860).

3. Florida (1868).

4. Idaho (1863).

5. Indiana (1838).

and "has remained substantially unchanged to the present time." *Ante,* at 119.

There apparently was no question concerning the validity of this provision or of any of the other state statutes when the Fourteenth Amendment was adopted. The only conclusion possible from this history is that the drafters did not intend to have the Fourteenth Amendment withdraw from the States the power to legislate with respect to this matter.

### III

Even if one were to agree that the case that the Court decides were here, and that the enunciation of the substantive constitutional law in the Court's opinion were proper, the actual disposition of the case by the Court is still difficult to justify. The Texas statute is struck down *in toto,* even though the Court apparently concedes that at later periods of pregnancy Texas might impose these selfsame statutory limitations on abortion. My understanding of past practice is that a statute found

6. Iowa (1843).
7. Maine (1840).
8. Massachusetts (1845).
9. Michigan (1846).
10. Minnesota (1851).
11. Missouri (1835).
12. Montana (1864).
13. Nevada (1861).
14. New Hampshire (1848).
15. New Jersey (1849).
16. Ohio (1841).
17. Pennsylvania (1860).
18. Texas (1859).
19. Vermont (1867).
20. West Virginia (1863).
21. Wisconsin (1858).

to be invalid as applied to a particular plaintiff, but not unconstitutional as a whole, is not simply "struck down" but is, instead, declared unconstitutional as applied to the fact situation before the Court. *Yick Wo* v. *Hopkins,* 118 U. S. 356 (1886); *Street* v. *New York,* 394 U. S. 576 (1969).

For all of the foregoing reasons, I respectfully dissent.