EDITH H. JONES, Circuit Judge,
concurring:
I agree that Ms. McCorvey’s Rule 60(b) case is now moot. A judicial decision in her favor cannot turn back Texas’s legislative clock to reinstate the laws, no longer effective, that formerly criminalized abortion.
It is ironic that the doctrine of mootness bars further litigation of this case. Mootness confines the judicial branch to its appropriate constitutional role of deciding actual, live cases or controversies. Yet this case was born in an exception to mootness[1] and brought forth, instead of a confined decision, an “exercise of raw judicial power.” Roe v. Bolton, 410 U.S. 179, 222, 93 S.Ct. 762, 763, 35 L.Ed.2d 147 (1973) (White, J., dissenting). Even more ironic is that although mootness dictates that Ms. McCorvey has no “live” legal controversy, the serious and substantial evidence she offered could have generated an important debate over factual premises that underlay Roe.
McCorvey presented evidence that goes to the heart of the balance Roe struck between the choice of a mother and the life of her unborn child. First, there are about a thousand affidavits of women who have had abortions and claim to have suffered long-term emotional damage and impaired relationships from their decision.[2] Studies by scientists, offered by McCorvey, suggest that women may be affected *851 emotionally and physically for years afterward and may be more prone to engage in high-risk, self-destructive conduct as a result of having had abortions.[3] Second, Roe’s assumption that the decision to abort a baby will be made in close consultation with a woman’s private physician is called into question by affidavits from workers at abortion clinics, where most abortions are now performed. According to the affidavits, women are often herded through their procedures with little or no medical or emotional counseling.[4] Third, MeCorvey contends that the sociological landscape surrounding unwed motherhood has changed dramatically since Roe was decided. No longer does the unwed mother face social ostracism, and government programs offer medical care, social services, and even, through “Baby Moses” laws in over three-quarters of the states, the option of leaving a newborn directly in the care of the state until it can be adopted.[5] *852 Finally, neonatal and medical science, summarized by McCorvey, now graphically portrays, as science was unable to do 31 years ago, how a baby develops sensitivity to external stimuli and to pain much earlier than was then believed.[6] In sum, if courts were to delve into the facts underlying Roe’s balancing scheme with present-day knowledge, they might conclude that the woman’s “choice” is far more risky and less beneficial, and the child’s sentience far more advanced, than the Roe Court knew.
This is not to say whether McCorvey would prevail on the merits of persuading the Supreme Court to reconsider the facts that motivated its decision in Roe.[7] But the problem inherent in the Court’s decision to constitutionalize abortion policy is that, unless it creates another exception to the mootness doctrine, the Court will never be able to examine its factual assumptions on a record made in court. Legislatures will not pass laws that challenge the trimester ruling adopted in Roe (and retooled as the “undue burden” test in Casey; see Casey, 505 U.S. at 872-78, 112 5.Ct. at 2817-21). No “live” controversy will arise concerning this framework. Consequently, I cannot conceive of any judicial forum in which McCorvey’s evidence could be aired.
At the same time, because the Court’s rulings have rendered basic abortion policy beyond the power of our legislative bodies, the arms of representative government may not meaningfully debate McCorvey’s evidence. The perverse result of the Court’s having determined through constitutional adjudication this fundamental social policy, which affects over a million women and unborn babies each year, is that the facts no longer matter. This is a peculiar outcome for a Court so committed to “life” that it struggles with the particular facts of dozens of death penalty cases each year.
Hard and social science will of course progress even though the Supreme Court *853 averts its eyes. It takes no expert prognosticator to know that research on women’s mental and physical health following abortion will yield an eventual medical consensus, and neonatal science will push the frontiers of fetal “viability” ever closer to the date of conception. One may fervently hope that the Court will someday acknowledge such developments and re-evaluate Roe and Casey accordingly. That the Court’s constitutional decisionmaking leaves our nation in a position of willful blindness to evolving knowledge should trouble any dispassionate observer not only about the abortion decisions, but about a number of other areas in which the Court unhesitatingly steps into the realm of social policy under the guise of constitutional adjudication.

. See Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1973) ("Pregnancy provides a classic justification for a conclusion of nonmootness. It truly could be 'capable of repetition, yet evading review’.”) (citations omitted).

. R. at 15-1410, Affidavits of More Than One Thousand Post-Abortive Women.

. See R. at 1669-1718, Affidavit of David Reardon, Ph.D. (reporting on clinical and scientific findings demonstrating that abortion is linked to emotional, physical, and psychological problems in women and criticizing the studies relied on by the Roe Court). See also C.A. Barnard, The Long-Term Psychosocial Effects of Abortion (Portsmouth, NH: Institute for Pregnancy Loss, 1990); W. Franz & D. Reardon, Differential Impact of Abortion on Adolescents and Adults, 27(105) Adolescence 161-72 (1992); M. Gissler, et al., Suicides after pregnancy in Finland: 1987-94: register linkage study, BMJ, 313:1431-4 (1996); B. Lask; J. Lydon, et al., Pregnancy Decision Making as a Significant Life Event: A Commitment Approach, 71(1) Journal of Personality and Social Psychology, 141-51 (1996); B. Major & C. Cozzarelli, Psychosocial Predictors of Adjustment to Abortion, 48(3) Journal of Social Issues, 48(3) 121-42 (1992); W.B. Miller, An Empirical Study of the Psychological Antecedents and Consequences of Induced Abortion, 48(3) Journal of Social Issues 67-93 (1992); W.B. Miller, Testing a Model of the Psychological Consequences of Abortion, The New Civil War: The Psychology, Culture, and Politics of Abortion, (American Psychological Assoc., Linda J. Beckman & S. Maria Harvey, eds. Washington, DC, 1998); H. Soderberg, et al., Emotional distress following induced abortion: A Study of incidence and determinants among abortees in Malmo Sweden, 79 Eur. J. Obstet. Gynecol. Reprod. Biol. 173-78 (1998); H.P. Vaughan, Canonical Variates of Post Abortion Syndrome (Portsmouth, NH: Institute for Pregnancy Loss, 1990); Gail B. Williams, Induced Elective Abortion and Pre-natal Grief (cited by Reardon).

. See, e.g., R. at 1721-57, Affidavit of David Reardon, Ph.D. (reporting, based on numerous studies, investigations and interviews, that women visiting abortion clinics receive little to no counseling (and what counseling is received is heavily biased in favor of having an abortion), are rushed through the process, and exposed — without sufficient warning — to health risks ranging from unsanitary clinic conditions to physical and psychological damage); R. at 1668-1804, Exhibits to Affidavit of David Reardon, Ph.D. (studies, full interviews, and other analysis supporting conclusions); R. 4308-5188 Client Intake Records from Pregnancy Care Centers (cataloging the emotional, physical, and psychological symptoms felt by hundreds of women after having an abortion who then sought post-abortion counseling); R. at 5189-96 Affidavit of Carol Everett (written testimony of a former abortion clinic worker, reporting that, in her clinic, both abortion counselors and physicians worked on commission and aggressively followed a script to encourage prompt election of the procedure — even when the patient was not pregnant; that physicians usually performed 10 to 12 abortions per hour; that the clinic transported women to hospitals secretly by car " when complications arose (to avoid bad publicity); and that she saw one woman die and 19 others permanently maimed by abortion procedures); R. at 10, Affidavit of Norma MeCorvey (describing abortion facilities based upon her work experience in clinics).

. See Ala.Code § 26-25-1 et seq. (2000); Ariz. Rev.Stat. § 13-3623.01 (2001); Ark.Code Ann. § 9-34-202 (Michie 2001); Cal. Health & Safety Code § 1255.7 (Deering 2000); Colo.Rev. Stat. § 19-3-304.5 (2000); Conn. Gen.Stat. § 17a-57 et seq. (2000); Del.Code Ann. tit. 16 § 907A (2001); Fla. Stat. Ann. § 383.50 et seq. (West 2000); Ga.Code Ann. § 19-10A-1 et seq. *852 (2002); Idaho Code § 39-8201 et seq. (2001); 325 III. Comp. Stat. 2/1 et seq. (West 2001); Ind.Code § 31-34-2.5-1 et seq. (Michie 2000); Iowa Code § 233.1 et seq. (2001); Kan. Stat. Ann. § 38-15,100 (2000); Ky.Rev.Stat. Ann. § 405.075 (2002); La. Ch.Code art. 1151 (West 2000); Me.Rev.Stat. Ann. tit. 17-A§ 553 (2002); Md.Code Ann. Cts. & Jud. Proc. § 5-641 (2002); Mich. Comp. Laws § 750.135 (2000); Minn.Stat. § 145.902 (2000); Miss.Code Ann. § 43-15-201 et seq. (2001); Mo.Rev.Stat. § 210.950 (2002); Mont.Code Ann. § 40-6-401 et seq. (2001); N.Y. Penal § 260.03; Penal § 260.15; and, Soc. Serv. § 372-g (2000); N.C. Gen.Stat. § 7B-500 (2001); N.D. Cent.Code § 50-25.1-15 (2001); Ohio Rev.Code Ann. § 2151.3515 et seq. (Anderson 2001); Okla. Stat. tit. 10 § 7115.1 (2001); Or.Rev.Stat. § 418.017 (2001); Pa. Stat. Ann. tit. 23 § 6501 et seq. (2002); R.I. Gen. Laws §23-13.1-1 et seq. (2001); S.C.Code Ann. § 20-7-85 (2000); S.D. Codified Laws § 25-5A-27 et seq. (Michie 2001); Tenn.Code Ann. § 68-11-255 (2001); Tex. Fam.Code Ann. § 262.301 et seq. (West 1999); Utah Code Ann. § 62A-4a-801 et seq. (2001); Wash. Rev.Code § 13.34.360 (2002); W. Va.Code § 49-6E-1 et seq. (2000); Wis. Stat. Ann. §49.195 (West 2001); Wyo. Stat. Ann. § 14-11-101 et seq. (Michie 2003).

. See R. 5197-5347 (submissions from numerous individuals, each holding an MD or PhD, reporting that unborn children are sensitive to pain from the time of conception, and relying on peer-reviewed, scientific journals). See, e.g., Mann et al., Prevention of Allogeneic Fetal Rejection by Tryptophan Catabolism, 281 Science 1191 (1998); P.W. Mantyh, Inhibition of Hyperalgesia by Ablation of Lamina I Spinal Neurons Expressing the Substance P Receptor, 278 Science 275 (1997)(cited by Dr. David Fu Chi Mark, Ph.D).

. Indeed, the Court seems disinclined ever to reconsider the facts, especially since in Casey, the Court’s determinative plurality opinion refuses to justify Roe on its own terms and states conclusionally that "no change" in regard to the viability of a fetus’s life "has left [Roe’s] central holding obsolete.” Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 860, 112 S.Ct. 2791, 2812, 120 L.Ed.2d 674 (1992) (plurality opinion).