NORTHCUTT, J.,
Concurring.
I fully endorse the thoughtful majority opinion. I write separately to more fully explain my reasons for concluding that the circuit court abused its discretion in this matter.
Three decades ago, the Florida Supreme Court issued Canakaris v. Canakaris, 382 So.2d 1197 (Fla.1980), in which it expounded on the nature of judicial discretion and the standard of review for reviewing discretionary rulings. Courts and litigants often invoke Canakaris for the proposition that an abuse of judicial discretion may be found only when no reasonable person would agree with the lower court’s ruling. Id. at 1203. But they frequently overlook the critically important central components of that “reasonableness” test:
The trial court’s discretionary power is subject only to the test of reasonableness, but that test requires a determination of whether there is logic and justification for the result. The trial courts’ discretionary power was never intended to be exercised in accordance with whim or caprice of the judge nor in an inconsistent manner. Judges dealing with cases essentially alike should reach the same result. Different results reached from substantially the same facts comport with neither logic nor reasonableness.

Id.

Of course, in addition to the notions that there must be some logic and justification *890 for a discretionary ruling, and that similar cases should lead to similar results, judicial discretion is constrained by another important parameter that is applicable to all judicial rulings: it must comport with the law and the evidence. Under the circumstances presented in this case, the circuit court’s conclusion that Doe was not sufficiently mature to decide for herself whether to terminate her pregnancy failed the reasonableness test.
As the majority opinion points out, the circumstances of this case are substantially similar to those in In re Doe, 36 So.3d 164 (Fla. 2d DCA 2010), in which we held that the record did not support the circuit court’s determination that the petitioner was not sufficiently mature to decide to terminate her pregnancy. There are two seeming differences between the cases.[2] First, in the 2010 ease the petitioner had consulted a trusted adult relative about her decision; there is no evidence of such in this case. Some courts have considered it a hallmark of maturity that a petitioner has sought such counsel. But, obviously, her failure to do so is not necessarily evidence of immaturity, and it could have no practical significance at all in the absence of proof that she had a trusted adult confidante available to her. Because there was no such proof here, this factor was irrelevant to the question of Doe’s maturity.
I acknowledge that the other difference between this case and the prior one is, at least superficially, more significant. In the earlier case, the circuit court’s order made no mention of the petitioner’s demeanor as a factor affecting the court’s assessment of the petitioner’s maturity. In this case, however, the court weighed Doe’s purported demeanor heavily against her:
The court finds that the Petitioner does not fully appreciate the depth of the magnitude of this life altering choice. In fact, the court finds that the Petitioner was rather cavalier in her demeanor and responses concerning her overall depth of thoughtfulness to this extremely important decision.
Yet, the evidence was uncontested that this young woman had investigated the medical risks associated with the termination procedure and that she had weighed them against the relative gravity of her alternatives. Doe had considered what she would do if she developed physical complications, i.e., she would return to the clinic or go to an emergency room. If she experienced emotional difficulties, she said, she would seek counseling or find someone to talk to. (The circuit court’s findings mentioned this testimony but omitted Doe’s reference to counseling.)[3]
Doe’s testimony also reflected her awareness that abortion is a controversial *891 procedure about which many people have strong feelings; she reported that her mother was “completely against” it, to the point that Doe believed her mother would banish her from their home if she learned of her intention to terminate the pregnancy. Finally, she recognized that childrear-ing, or merely a full-term pregnancy, would substantially interfere with or altogether thwart her educational and career plans as well as her ability to meet her significant responsibilities at home — particularly those involving her younger sibling, whom she was helping to rear. In other words, in Doe’s view, a decision not to terminate the pregnancy would be life altering.
In light of the uncontradicted evidence, it is impossible to dispute that assessment. Doe’s concerns were not the insubstantial worries of a frivolous schoolgirl. They related directly to her ability to carry out her important existing responsibilities and to accomplish specific educational and professional objectives that would determine the quality of the rest of her life. As the United States Supreme Court has observed:
[T]he potentially severe detriment facing a pregnant woman, see Roe v. Wade, [410 U.S. 113, 153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) ], is not mitigated by her minority. Indeed, considering her probable education, employment skills, financial resources, and emotional maturity, unwanted motherhood may be exceptionally burdensome for a minor. In addition, the fact of having a child brings with it adult legal responsibility, for parenthood, like attainment of the age of majority, is one of the traditional criteria for the termination of the legal disabilities of minority. In sum, there are few situations in which denying a minor the right to make an important decision will have consequences so grave and indelible.
Bellotti v. Baird, 443 U.S. 622, 642, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979).[4]
*892 It is difficult, then, to fathom what the circuit court meant by its assertion that Doe did not sufficiently appreciate the “depth of the magnitude of this life altering choice,” or its criticism of her “overall depth of thoughtfulness to this extremely important decision.” To the contrary, the unmistakable import of the evidence was that this young woman knew precisely what is at stake for her. I can only surmise, without knowing, that the court’s remarks referred not to the accuracy of Doe’s assessment of the choices available to her, but to her failure to express ethical or moral ambivalence about her decision to terminate the pregnancy. Notably, she was not questioned on the topic. But if this is what gave the court pause about Doe’s “depth of thoughtfulness,” I submit that the court demanded more of her than the law permits.
In Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, the United States Supreme Court addressed the constitutionality of the Texas abortion statute. The Court prefaced its analysis with a lengthy examination of the widely disparate views, both historical and contemporary, about the beginning of life. The Court concluded that “[i]n view of all this, we do not agree that, by adopting one theory of life, Texas may override the rights of the pregnant woman that are at stake.” Id. at 162. The Court ultimately concluded that the state’s interest in regulating abortion is confined to protecting the mother’s health after the first trimester of pregnancy and protecting “the potentiality of human life” after the second trimester. Id. at 162-63. During the first trimester, the Court held, the decision whether to terminate a pregnancy is strictly a matter between the pregnant woman and her physician, free of interference or regulation by the state. Id. at 163. In other words, a pregnant woman is constitutionally entitled to elect between proceeding with her pregnancy or terminating it consistent with her own ethical, moral, or religious convictions, or lack thereof — and unburdened by the state’s assertion that she should feel differently about it.
Jane Doe has that very right, and if she is sufficiently mature, she is entitled to invoke it without consulting a parent. The parental notification requirement is justified only by the state’s interest in protecting immature minors who lack the ability to intelligently and independently weigh their choices. The Supreme Court has observed that it is rational for the state to assume that the family will “strive to give a lonely or even terrified minor” guidance to assist her with her decision. Ohio v. Akron Center for Reproductive Health, 497 U.S. 502, 520, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990). It would be irrational to hold that a woman who is only a few weeks shy of her eighteenth birthday, who *893 is fully aware of the position her parent would take, and who has made a different choice for herself based on sound, realistic reasoning, is not mature enough to do so because she is not sufficiently overwrought or ambivalent about her decision. The circuit court’s conclusion to that effect failed the reasonableness test, and therefore it was an abuse of discretion.

. The dissent perceives other differences that are certainly immaterial to the question whether this young woman is sufficiently mature to assess and choose from among her alternative courses. For instance, it quibbles that, unlike the petitioner in the earlier case, at the time of the hearing below Doe had not yet consulted a physician. But she did have an appointment for the following week. The significance vis-a-vis the question of her maturity is that she recognized the importance of obtaining medical advice and-had arranged to do so. As I have observed in the past, it is not the specific purpose of the maturity determination to apprise minors of the medical risks associated with terminating their pregnancies. That function is served by another statute that requires this information to be given to every woman, young or old, as part of her informed consent to a termination procedure. See § 390.0111(3), Fla. Stat. (2012). In re Doe, 973 So.2d 548, 570 n. 15 (Fla. 2d DCA 2008) (Northcutt dissenting).

. There were other instances in which the order portrayed evidence in terms that effectively mischaracterized it. For example, the evidence reflected that Doe prepares her fam *891 ily's meal every night and does much of the household cleaning. Weekdays, she is responsible for waking her younger sibling and getting [him/her] ready for and off to school. (For obvious reasons, I avoid specifying the sibling’s gender to further protect Doe’s identity.) When the sibling returns home in the afternoon, Doe assigns [him/her] chores and oversees homework. The uncontestable import of the evidence is that Doe bears significant responsibility for running the household and rearing her sibling, and she does so largely independently of her mother, with whom she has only a distant, passing relationship. But on this topic the court’s order recounted merely that Doe "takes care of her [sibling] when her mother is at work. She fixes meals for [him/her] and helps with homework.” The dissent, as well, contains similarly inaccurate representations of the evidence. Thus it remarks that Doe "described termination by pill as resulting in a ‘normal period’.” In fact, Doe’s testimony clearly imparted her understanding that the pill achieves its purpose by inducing a miscarriage.
By these observations I intend no criticism of my colleagues on either this court or the circuit court, both of whom undertook this important matter in a considered, professional manner while under severe time restraints. However, neither the presumption of correctness in favor of a lower court’s ruling nor the abuse of discretion standard of review authorize an appellate court to accept findings that are at odds with uncontested facts in the record.

. On the other hand, the courts have long recognized that the medical risks associated with a first trimester termination are less or no greater than those attendant to childbirth. See Roe v. Wade, 410 U.S. at 163, 93 S.Ct. 705.
Moreover, after conducting a comprehensive review of credible studies, the American Psychological Association Task Force on Mental Health and Abortion reported that
the prevalence of mental health problems observed among women in the United States who had a single, legal, first-trimester abortion for nontherapeutic reasons appeared to be consistent with normative rates of comparable mental health prob *892 lems in the general population of women in the United States. Consider, for example, the overall prevalence of depression among women in the [National Longitudinal Survey of Youth: 1992], a longitudinal national survey of a cohort of men and women aged 14-21 years in 1979. Among all women in the NLSY, irrespective of reproductive history and without controlling for any covari-ates, 22% met criteria for depression in 1992 (i.e., scored above the clinical cutoff on the CES-D). Among women who reported one abortion, the corresponding percentage was 23%.
American Psychological Association, Task Force on Mental Health and Abortion, Report of the Task Force on Mental Health and Abortion at 91 (2008). The APA Task Force concluded that “among women who have a single, legal, first-trimester abortion of an unplanned pregnancy for nontherapeutic reasons, the relative risks of mental health problems are no greater than the risks among women who deliver an unplanned pregnancy.” Report of the Task Force at 92.